271 N.J. Super. 261 (1994)
638 A.2d 849
ROBIN PESKIN, A/K/A ROBIN SHULMAN, PLAINTIFF-RESPONDENT,
v.
ROGER PESKIN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1993.
Decided March 3, 1994.
*263 Before Judges MICHELS, SKILLMAN and KESTIN.
Herbert J. Stern argued the cause for appellant (Stern & Greenberg, attorneys; David S. Stone, of counsel; Mr. Stern, Mr. Stone and Howard D. Cohen, on the brief).
Gerald D. Miller argued the cause for respondent (Miller, Meyerson, Schwartz & Corbo, attorneys; Mr. Miller, of counsel and on the brief).
MICHELS, P.J.A.D.
Defendant Roger Peskin appeals from three post-judgment orders of the Chancery Division, Family Part, entered in this protracted matrimonial action involving his former wife, Robin Peskin, a/k/a Robin Shulman. The orders denied defendant's motion to vacate a final judgment of divorce and the settlement upon which it was based, denied his supplemental motion for an evidential hearing on the issues of duress and his capacity to enter into the settlement, enforced various provisions of the judgment, and awarded counsel fees to plaintiff's attorney, James P. Yudes, Esq. and to plaintiff's court-appointed guardian ad litem, David M. Paris, Esq.
The pivotal issue raised by this appeal is whether the trial court coerced the settlement, thereby rendering it a nullity and requiring that the final judgment of divorce and the settlement incorporated therein be vacated and set aside, and the matter remanded to the trial court for completion of the trial. Defendant contends essentially that he was suffering from severe clinical depression, he was taking powerful anti-depression medication at the time the settlement was negotiated, and he "was forced by way of a withering cross-examination conducted by the [trial court] to *264 submit to [an] extraordinary `settlement' which required him after a nine-year marriage, among other things, to pay equitable distribution in the amount of $525,000 in cash plus other assets, including his marital home in Short Hills, New Jersey; to purchase term [life] insurance policies totaling $500,000 on his own life payable to plaintiff at a progressively escalating cost; to pay attorney's fees and expert's fees in the amount of $250,000; and finally to pay permanent alimony of $120,000 per year to plaintiff."
This divorce action commenced in August 1988. After extensive pretrial discovery and the appointment of Mr. Paris as guardian ad litem for plaintiff, the trial commenced on October 17, 1991 and ended four months later on February 25, 1992, when the matter was settled in open court. The trial extended over a four-month period because it was not conducted on a continuous, day-to-day basis. In fact, the trial took place over a total of only sixteen days. The many interruptions were caused, in part, by the financially complex nature of this matter. On February 25, 1992, after the proofs dealing with the financial aspects of the divorce had been completed and the presentation of evidence with respect to plaintiff's tort claim under Tevis v. Tevis, 79 N.J. 422, 400 A.2d 1189 (1979), had begun, the parties settled the matter in open court. Defendant, who had been involved in extensive settlement discussions during the course of trial, later contended that the settlement was not voluntary but was the product of coercion by the trial court.
To put this issue in proper perspective, it is necessary to review in some detail the events and colloquies that took place in open court on February 24 and 25, 1992, prior to defendant's in-court agreement to settle. On February 24, 1992, after settlement discussions and immediately before plaintiff was to call her first witness with respect to the Tevis claim, defendant announced to the trial court that "I'd like to settle the case, but I'm concerned about my ability to meet the obligations here." After further discussion, the trial court informed defendant that "[t]here is no forced settlement in my courtroom, ever in any case" and further *265 explained to defendant that "[t]here's no penalty for not settling" and that his failure to settle "will not affect one aspect of my decision." Defendant immediately apologized saying, "I'm sorry, I, I, I,  it's so hard for me to make a decision like this because  " The trial court interrupted defendant, advised him that he did not have to make a decision, and directed the witness to take the stand. Defendant again repeated that "I'd like to settle and I'd like to settle as long as there's some " At this point, defendant's trial attorney, James Sharp, Esq., interrupted and stated, "There's no qualification, Roger. You either settle the case or you don't settle the case.... Do you agree to settle this case. Yes or no?" Defendant again tried to express his concern, but again was interrupted by his attorney who stated, "Roger, enough. Yes or no?" Defendant responded, "It's hard for me to do this because I'm not sure. I don't think I can make these  I can  I don't know if I can meet these obligations." Without responding, the trial court then swore the witness and the trial continued.
On February 25, 1992, after completion of another witness' testimony but before plaintiff took the stand, further settlement discussions ensued in open court. At the conclusion of these discussions, the trial court asked defendant if he wanted to settle, or if another witness should be called. Defendant responded, "Okay, I'll settle the case." The trial court thereupon asked Mr. Yudes to place the settlement on the record. While the terms of the settlement were being placed on the record and discussed by all parties, including defendant, defendant indicated that he was "having a problem" and commented, "I'm just kind of overwhelmed, that's all." The trial court asked defendant if defendant had a question or if he wanted a drink of water. Defendant replied, "Can I just calm down because I, I, I don't feel  I'll tell you ... I haven't been able to think about all the ramifications  " Further discussion again ensued between the trial court and defendant concerning the latter's ability to obtain a mortgage to satisfy the financial obligations imposed upon him by the settlement. Finally, Mr. Sharp asked the trial court for permission to confer with Edward Snyder, Esq., defendant's lead attorney, *266 because Mr. Sharp "would be a little bit more comfortable as I think Mr. Peskin would be if we could just ... reach out for [Mr. Snyder] ... to clarify the terms." The trial court agreed and recessed the trial to enable defendant and Mr. Sharp to meet with Mr. Snyder, who was on trial in another courtroom in the building.
Defendant, Mr. Snyder and Mr. Sharp subsequently returned to the courtroom. Defendant advised the trial court that he "didn't finish talking ... with Mr. Snyder." Mr. Sharp immediately informed the trial court that the only aspect of the discussion that had not been completed had nothing to do with the explanation of the terms, but concerned Mr. Snyder's apprehension about defendant's ability to answer questions that were going to be posed by the trial court regarding defendant's knowledge of the terms of the settlement and his acceptance of those terms. Mr. Sharp asked for more time to explain to defendant "what questions will be posed in that regard and why the answers must be as they should be." The trial court gave defendant and his attorneys more time and asked them to step outside the courtroom. Shortly thereafter, defendant and his attorneys returned. Mr. Snyder then informed the trial court:
Mr. Sharp and I have both recommended to Mr. Peskin that he accept the settlement. We're putting that on the record for obvious reasons. Mr. Peskin at this point and, and I'm just throwing, I'm honestly throwing this in the Court's lap because I don't know what else to do, is unable to make a decision. He will not tell us yes, and he will not say reject it and go to trial. That's all I have to say to, to Your Honor. I have nothing more  there's not, I don't know what more time I can spend to attempt to convince Mr. Peskin. [Emphasis added].
The trial court addressed defendant, noting that it had been led to believe that the case was being settled that morning "from words from your own mouth", that the terms of the settlement were placed on the record, that defendant had asked to clarify certain points, and that defendant then asked to have the opportunity to talk to counsel, which opportunity was given to him. Then the following colloquy took place between the trial court and defendant:
THE COURT: I will ask you and if you answer a word other than what I tell you to answer, I'm going to hold you in contempt. Do we understand that?

*267 You will just tell me very simply. If you agree to the settlement, I will then ask you a series of questions. And you will answer either yes or no. And if it's a no, then I will just consider this portion when I do a fee application because I consider this to be waste of time, quite frankly, and I would rather just conclude with the witnesses that I had expected to be here today. But I've given everybody at every juncture in this case the opportunity to settle.

So all I want to know from you is a yes or a no, not a question, not a qualification, not a clarification, as to whether or not you agreed to the settlement, yes or no? That word, if any other word comes out of your mouth, I'm going to hold you in contempt. Do you understand? Yes or no? [Emphasis added].
(PAUSE)
* * * * * * * *
THE COURT: I could ask some humor and say I'll play the jeopardy song and we can figure we have thirty seconds to write it down. But you say yes or no and then we'll go into some other questions, or we'll proceed with a witness. Yes or no and you now have thirty seconds to give that word. A word. And you have the choice of the word. Which is it?
(PAUSE)
Yes or no?
(PAUSE)
Yes or no, Mr. Peskin? I'm done with the dancing now. Yes or no. Nothing else.
(PAUSE)
No, no more questions. Yes or no, Mr. Peskin? You have the freedom to say no. Which one is it?
(PAUSE)
Yes, or no. Don't give me anything else at this posture.
(PAUSE)
MR. SNYDER: Is there anything that we can do to help, Judge?
THE COURT: No, we'll, we'll just give him his time for that word to come out. A word has to come out. There's a question asked, I want an answer.
MR. SNYDER: And I feel 

*268 MR. SHARP: Maybe you should cut to a commercial Judge.
THE COURT: I understand. Alright. See we do this every day for a living, and after awhile it sometimes becomes humorous but this has lost its humor. I just want a yes or no from you at this point.
THE DEFENDANT: You think this is funny. It's not funny.
THE COURT: Yes or no? Yes or no? We've tried to deal with it in every way, yes or no?
MR. PARIS: May I step outside, please?
MR. YUDES: Maybe it'd be best if I go outside too, Your Honor.
THE COURT: No, he can, you can stay.
MR. SNYDER: It seems to me, Judge, if he can't say yes 
THE COURT: Okay. Alright. We'll note the passage of time.
THE DEFENDANT: Yes, yes, Judge, I, I 
* * * * * * * *
THE DEFENDANT: I just want to ask  there's a problem 
THE COURT: I want the question answered first and then we'll go to all the problems that might exist. But I want the question answered.
MR. SNYDER: May, may, Your Honor, may I, may I express the problem that came up?
THE COURT: I've already done a number of them  not yet, because he's going to answer this and we're not going to get away from it. And then he can raise the problem.
(PAUSE)
THE DEFENDANT: Judge, I would like to say only that I just had a 
THE COURT: Doesn't sound like yes or no to me.
THE DEFENDANT: It, it's, it's yes I would like to but I 
THE COURT: No, not yes I would like to  yes, settle. That was the question.
THE DEFENDANT: I just don't know how I'm going to meet all the  yes, I would like to.
MR. SHARP: Forget it.
THE COURT: Okay. Alright, let me just explain this so we all understand it. I think, and I will tell myself I think this is fine. I'm going to break for lunch now. So we understand, when I step off this bench, I'm not taking a settlement in this case. Do we understand that? I am not going to take or listen to any prospect of settlement. I will not give one moment to the attorney to try and settle this case. I am trying the case to conclusion. Do we understand that? Alright, and that is what we are going to do.
And I will decide the entire case, including this portion of the claim. Do you now understand that? That it's now out of your hands. You don't have anything left to say yes or no to. You will just proceed to the end of the trial.

*269 THE DEFENDANT: So yes, I'll settle the case. [Emphasis added].
THE COURT: Yes, you agree to the settlement or not?
MR. SNYDER: He said yes.
THE DEFENDANT: Yes, yes.
THE COURT: I want this clear.
THE DEFENDANT: Yes, I'll agree.
THE COURT: Bring Mr. Paris back in. Now you listen to the questions I ask and there will be an opportunity for you to ask questions. Do you understand that?
THE DEFENDANT: Yes.
Thereupon the trial court inquired of defendant if he understood the terms of the settlement and if he had any questions concerning the terms. After further discussion of the terms and conditions of the settlement and defendant's obligations thereunder, and after defendant again expressed concern over his ability to meet those obligations as well as his obligation to pay his attorney's fee, the trial court inquired of defendant:
Now, Mr. Peskin, you have now understood the terms of the agreement as I see it. Under the circumstances, and I want you to be clear on this, in realizing this is a compromise of everyone's positions in this case, do you accept this agreement as fair and reasonable under the circumstances?
Defendant replied, "You know I don't really ," but before defendant could complete his statement, the trial court interrupted and stated:
No, that's not acceptable to me, okay. I don't really. This one is do you accept it as fair and reasonable under the circumstances. It requires a yes or a no answer.
Defendant then answered, "Yes."
Following this exchange, the trial court asked defendant if he now accepted the terms and provisions of the agreement freely and voluntarily, to which defendant answered, "Yes." The trial court also asked defendant, "You are not under the influence of any drug or alcohol that would impede understanding or acceptance of the terms and provisions of the agreement, is that correct?", to which defendant answered, "Yes." The trial was then concluded.
*270 The following day, February 26, 1992, defendant contacted Lawrence Vastola, Esq., his real estate attorney. According to Mr. Vastola, defendant was "extremely distraught and confused over the events surrounding the proceedings in court in his matrimonial matter which had occurred the previous day," and defendant advised him that he had been "subjected to overwhelming pressure to make a decision that day regarding disposition of his matrimonial matter." After meeting with defendant on February 28, 1992, Vastola recommended that defendant consult with Albert B. Jeffers, Esq. to review and evaluate the disposition of the matrimonial action. On February 29, 1992, defendant met with Mr. Jeffers. According to Mr. Jeffers, defendant then seemed in a "very agitated state" and appeared "confused and emotionally distraught." Mr. Jeffers said that defendant told him that "he felt that he was pressured into consenting to the terms of the settlement."
On March 3, 1992, defendant visited his treating physician, Dr. Hugh Prentice, who noted that defendant, who had been under Dr. Prentice's treatment for depression for the previous three months, "continued to suffer from depression." On March 4, 1992, defendant was hospitalized at the Carrier Foundation for psychiatric treatment for "severe depression." Defendant was treated on a daily basis by Dr. Philip M. Torrance II, a staff psychiatrist, until he was discharged on March 17, 1992. According to Dr. Torrance, defendant had grave difficulty deciding whether to engage in and continue psychiatric treatment, and defendant exhibited "a paralyzing degree of ambivalence and indecision." In his April 20, 1992 report, Dr. Torrance opined "with a reasonable degree of medical certainty" that defendant's "capacity to participate in decision making with regard to important issues with emotional implications was significantly impaired ... on 25 February 1992" due to his "anxiety, depression, and impaired cognition."
Dr. Torrance, in his June 16, 1992 certification, also expressed the opinion that, because defendant's "severe depression" on February 25, 1992 was "rooted in a thought disorder," to the "non-trained" *271 eyes of laypersons, defendant "would seemingly appear to understand what was being said to him," but "inwardly," because of his mental condition, defendant was "unable to process that information into a decision." Dr. Torrance further explained that, on February 25, 1992, "[n]o one at that time, not even Mr. Peskin, could fully comprehend the total paralysis he was experiencing in coming to a decision on the issue of settlement."
Dr. Torrance opined that, while defendant "knew" on February 25, 1992 that "he had to make a decision," defendant's "depression and associated thought disorder prevented him from doing so  at least to the extent of his own free will." Defendant's "paralysis in decision making" rendered him vulnerable to being "coerced into making a decision" by others. As Dr. Torrance explained, defendant's "repeated equivocations with [his] counsel and with the Court, and their unawareness of his medical and mental condition" caused, albeit unintentionally, his counsel and the trial court to experience "substantial frustration." This resulting "frustration on the part of others" caused them, in turn, to exert "tremendous psychological pressure" on defendant "to make a decision." Faced with this "overwhelming pressure," defendant "finally acquiesced" and agreed to the settlement, but, according to Dr. Torrance, his decision cannot be characterized as his own. The influence of the others in the courtroom "ultimately overcame [defendant's] own will." Consequently, defendant unintentionally "allow[ed] others to make the choice for him."
Dr. Torrance summed up his opinion of what happened on February 25, 1992 as follows: "In my medical judgment, Mr. Peskin's medical and mental condition materially interfered with the exercise of his own free will on February 25, 1992, because the pressures brought to bear upon him that day to make a decision became overwhelming. In effect, he was subjectively overborne by an oppressive set of circumstances. While it may be that no one intended to cause Mr. Peskin to be placed in that position, the medical fact of the matter is, he was."
*272 Mr. Jeffers notified the trial court by letter dated March 13, 1992 of what transpired between February 25, 1992 and March 12, 1992, including defendant's "nervous breakdown" and hospitalization on March 4, 1992, and of his March 10, 1992 telephone communication with Dr. Torrance. During that conversation the doctor opined that on February 25, 1992, defendant had been "incapable of making a decision" to settle or not "because his decision making process was flawed by the depression." Mr. Jeffers also informed the trial court that he concluded that "it was tenable ... to request that Mr. Peskin's consent be set aside." However, because Mr. Peskin was still hospitalized, Mr. Jeffers decided to delay taking any action. Mr. Jeffers notified the trial court that he anticipated that upon Mr. Peskin's substantial recovery, "[Mr. Peskin] may very well wish to take some further action with respect to the entry of the judgment." Although Mr. Jeffers did not formally move for any court action, his letter essentially requested that the "matter be held in abeyance" until Mr. Peskin recovered and could decide whether or not to challenge the consent to settlement. Unfortunately, Mr. Jeffers' March 13, 1992 letter arrived too late. On March 11, 1992, the trial court had signed the final judgment of divorce, which incorporated the February 25, 1992 settlement agreement.
Defendant retained another attorney and, on May 1, 1992, moved to vacate the judgment and the settlement incorporated therein. On June 16, 1992, defendant filed a supplemental motion requesting an "evidentiary hearing to present testimony with respect to [his] condition which existed on February 25, 1992." This supplemental motion was supported by the certifications of defendant, his father, his treating physicians, and his various attorneys, including his trial attorney, Mr. Sharp. Plaintiff did not submit any certification or other evidence in an attempt to rebut the uncontroverted medical testimony submitted by defendant's treating physicians.
Following argument, the trial court found that defendant "had the ability to understand, had the ability to make decisions, [and] *273 chose his decision" to settle. The trial court denied defendant's motion to vacate the settlement and set aside the judgment, and denied defendant's supplemental motion for an evidential hearing, reasoning in part as follows:
It's my belief that on the day in question, and whether my eyes deemed by reviewing authority to be untrained that the medical testimony outweighs my particular opinion, but also from the demeanor of the witness as it appeared during the days of trial commencing in October, and ending in February  that in fact at all times he understood what was transpiring here. At all times he exercised the decision making capacity that he ran a business during that time period  there was never one scintilla of testimony from any witness presented that he had difficulty in his daily operation of that business, or otherwise.
* * * * * * * *
Never once prior to February 25 does anyone ever say to me I have a problem with Mr. Peskin.
Does anyone ever say to me, Mr. Peskin wants to present testimony as to his mental well being.
Mr. Peskin makes attempts to delay, in my opinion, the decision making, and in fact the court affords that delay in my opinion, on numerous occasions so that Mr. Peskin can be sure when he makes a decision it's a correct one.
* * * * * * * *
The court will not in fact vacate the settlement placed upon the record and will hold both parties bound to that settlement. The court will not hold an evidentiary hearing in [the] alternative to determine that. I feel that the certifications placed in the record by counsel would be sufficient for Appellate review. I have in fact reviewed them, none of the individuals presented anything to the court prior to that date, and I question quite frankly, if during this time Mr. Peskin is seeing the individuals from a time and commencement in November, and then with more certainty of medication back in December, that aware that he's going through a trial, and having completed a component that someone doesn't cry out and say look you can't go through with this in this condition.
Now, whether or not they only after the fact become aware of what they now tell me with some degree as they refer to it, of medical certainty, and I don't believe that this situation  quite frankly  based on what transpired on that date, and based on some of the testimony from a credibility standpoint that took place, tried to make every effort to be assured that Mr. Peskin had opportunity [to] consult with anyone he chose during this time period.
Finally, the trial court emphasized that it had made it clear to defendant that it did not compel defendant "to say yes he will settle." The trial court further explained that defendant "had the option to say no" and that this opportunity and the trial court's *274 subsequent actions "made it clear to Mr. Peskin that no penalty would accrue to him, [and] no prejudice would occur, except [that] the matter would proceed to closure" if defendant did not settle the case. The trial court also entered an order enforcing the judgment and assessing counsel fees of $7,000 against defendant for his motion to vacate the prior settlement agreement. This appeal followed.
Defendant seeks a reversal of the challenged orders, a vacation of the judgment and the settlement incorporated therein, and a remand of the matter to the trial court with direction that the trial proceed to a conclusion in front of a different trial judge. Alternatively, defendant seeks a remand of the matter to a different trial judge for a plenary hearing on the validity of the settlement, with particular emphasis on the issues of duress and his capacity to voluntarily consent to the settlement agreement consistent with the principles discussed in Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 521 A.2d 872 (App.Div. 1987). Defendant argues that the record demonstrates that he was coerced by the trial court and his attorneys to settle the case and that such settlement occurred under extreme duress; that the unrebutted medical testimony demonstrates that he did not have the capacity to consent to a settlement; that the trial court erred in refusing to grant an evidentiary hearing on the issues of duress and his capacity to enter into the settlement; and that the matter must be remanded for any further trial or evidentiary hearing before another trial judge.
It is fundamental that the settlement of litigation ranks high in the public policy of this state. Ziegelheim v. Apollo, 128 N.J. 250, 263, 607 A.2d 1298 (1992); Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990); Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 35, 134 A.2d 761 (1957); Lahue v. Pio Costa, 263 N.J. Super. 575, 595, 623 A.2d 775 (App.Div.), certif. denied, 134 N.J. 477, 634 A.2d 524 (1993); American Home Assur. Co. v. Hermann's Warehouse Corp., 215 N.J. Super. 260, 265-66, 521 A.2d 903 (App.Div. 1987), aff'd 117 N.J. 1, 563 A.2d 444 (1989); Dep. of Pub. Advocate v. *275 N.J. Bd. of Pub. Ut., 206 N.J. Super. 523, 528, 503 A.2d 331 (App.Div. 1985); Pascarella v. Bruck, 190 N.J. Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983); Honeywell v. Bubb, 130 N.J. Super. 130, 135, 325 A.2d 832 (App.Div. 1974); Jannarone v. W.T. Co., 65 N.J. Super. 472, 476, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961). As such, settlements should be encouraged. Ziegelheim v. Apollo, supra, 128 N.J. at 263, 607 A.2d 1298; Judson v. Peoples Bank & Trust Co., supra, 25 N.J. at 35, 134 A.2d 761; Davidson v. Davidson, 194 N.J. Super. 547, 550, 477 A.2d 423 (Ch.Div. 1984) (settlements should be encouraged especially in family law actions). The goal of the policy which encourages settlements, however, "is not the salutary effect of settlements on our overtaxed judicial and administrative calendars (although this is an undeniable benefit), but the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." Dep. of Pub. Advocate v. N.J. Bd. of Pub. Ut., supra, 206 N.J. Super. at 528, 503 A.2d 331.
Courts play an important role in effecting settlement. However, that role must always be exercised appropriately and with full recognition that the court must remain fair and impartial in order to ensure that the "settlement [is] wrought by the parties, not by [the court]." 75 Am.Jur.2d Trial § 287 at 505 (1991). A settlement between parties to a lawsuit is a contract like any other contract. Nolan v. Lee Ho, supra, 120 N.J. at 472, 577 A.2d 143; see also De Caro v. De Caro, 13 N.J. 36, 44, 97 A.2d 658 (1953). Settlement agreements must be voluntarily made and "freely entered into." Pascarella v. Bruck, supra, 190 N.J. Super. at 124, 462 A.2d 186. Consequently, courts should never work to coerce or compel a litigant to make a settlement. In re NLO, Inc., 5 F.3d 154, 157 (6th Cir.1993); Newton v. A.C. & S., Inc., 918 F.2d 1121, 1128 (3d Cir.1990); Cropp v. Woleslagel, 207 Kan. 627, 485 P.2d 1271, 1276 (1971); Schunk v. Schunk, 84 A.D.2d 904, 446 N.Y.S.2d 672, 672-73 (1981) (courts should not exert undue pressure *276 on litigants to settle, especially in the context of a divorce settlement); Chomski v. Alston Cab Co., Inc., 32 A.D.2d 627, 299 N.Y.S.2d 896, 897 (1969); Wolff v. Laverne, 17 A.D.2d 213, 233 N.Y.S.2d 555, 557 (1962). Courts should not use the threat of sanctions to force the settlement of a case. See Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 146 (4th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); Kothe v. Smith, 771 F.2d 667, 669 (2d Cir.1985); Del Rio v. Northern Blower Co., 574 F.2d 23, 26 (1st Cir.1978). In sum, the law simply "does not countenance attempts by courts to coerce settlements" and, therefore, courts must "avoid the appearance (as well as the reality) of coercion" of settlements from "unwilling litigants." In re Ashcroft, 888 F.2d 546, 547 (8th Cir.1989). See also, generally, D.L. Spillman, Jr., Annotation, Propriety and Prejudicial Effect of Suggestion or Comments by Judge as to Compromise or Settlement of Civil Case, 6 A.L.R.3d 1457 (1966).
If a settlement agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside. See Nolan v. Lee Ho, supra, 120 N.J. at 472, 577 A.2d 143; De Caro v. De Caro, 13 N.J. 36, 41-42, 44, 97 A.2d 658 (1953); Honeywell v. Bubb, supra, 130 N.J. Super. at 136-37, 325 A.2d 832. For example, in Kothe v. Smith, supra, the District Court judge recommended that the case be settled for between $20,000 and $30,000, and warned the parties that if they settled for a comparable figure after trial had begun, he would impose sanctions against the dilatory party. 771 F.2d at 669. Defendant's malpractice insurer offered $5,000 on the day before trial, which plaintiff rejected. Plaintiff's lowest pretrial settlement demand was $50,000. Nevertheless, when the case was settled for $20,000 after one day of trial, the judge penalized defendant alone. Ibid. Although the trial judge was not involved in the settlement negotiations, the Second Circuit Court of Appeals vacated the judgment, stating:
Although the law favors the voluntary settlement of civil suits, ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 997 (2d Cir.1983), it does not sanction *277 efforts by trial judges to effect settlements through coercion. Del Rio v. Northern Blower Co., 574 F.2d 23, 26 (1st Cir.1978) (citing Wolff v. Laverne, Inc., 17 A.D.2d 213, 233 N.Y.S.2d 555 (1962)); see MacLeod v. D.C. Transit System, Inc., 283 F.2d 194, 195 n. 1 (D.C. Cir.1960); 89 C.J.S., Trial, § 577 at 355. In the Wolff case, cited with approval in Del Rio, supra, the Court said:
We view with disfavor all pressure tactics whether directly or obliquely, to coerce settlement by litigants and their counsel. Failure to concur in what the Justice presiding may consider an adequate settlement should not result in an imposition upon a litigant or his counsel, who reject it, of any retributive sanctions not specifically authorized by law.
17 A.D.2d at 215, 233 N.Y.S.2d 555. In short, pressure tactics to coerce settlement simply are not permissible. Schunk v. Schunk, 84 A.D.2d 904, 905, 446 N.Y.S.2d 672 (1981); Chomski v. Alston Cab Co., 32 A.D.2d 627, 299 N.Y.S.2d 896 (1969). "The judge must not compel agreement by arbitrary use of his power and the attorney must not meekly submit to a judge's suggestion, though it be strongly urged." Brooks v. Great Atlantic & Pacific Tea Co., 92 F.2d 794, 796 (9th Cir.1937). [771 F.2d at 669].
* * * * * * * *
Although we commend ... [the trial judge] for his efforts to encourage settlement negotiations, his excessive zeal leaves us no recourse but to remand the matter with instructions to vacate the judgment. [Id. at 670].
Similarly, in Newton v. A.C. & S., Inc., 918 F.2d 1121 (3d Cir.1990), although the Third Circuit Court of Appeals did not vacate a judgment entered on a settlement, it vacated the fines imposed upon defendants by the District Court judge because of their failure to settle by a certain date prior to the commencement of the trial, on the ground that the fines violated due process. The court commented:
Although the facilitation of settlements is a laudable goal, "pressure tactics to coerce settlement simply are not permissible." Kothe v. Smith, 771 F.2d 667, 669 (2nd Cir.1985). "[T]he court should never work to coerce or compel a litigant to make a settlement." Del Rio v. Northern Blower Co., 574 F.2d 23, 26 (1st Cir.1978) (quoting Cropp v. Woleslagel, 207 Kan. 627, 633, 485 P.2d 1271 (1971)). When the district court fined only the settling defendants, regardless of fault, it created impermissible pressure on the defendants to alter their course in settling cases. [Id. at 1128].
Analogously, in Continental Ins. Co. v. First Wyoming Bank, 771 P.2d 374, 376 (Wyo. 1989), vacated in part on other grounds, 860 P.2d 1094 (Wyo. 1993), the Wyoming Supreme Court vacated a judgment on the merits and reassigned the case to a different trial judge after the trial judge advised the parties and their attorneys *278 that, if they did not "make an effort to take care of this case" and settle the matter, "I can guarantee you much pain."
We are convinced from our study of the record that defendant was improperly coerced into settling this matter. The trial court commented that it would consider defendant's refusal to settle in connection with any fee application, that it would hold defendant in contempt if he answered the question as to settlement other than with a "yes" or "no", and finally, that when it took a "break for lunch" that it would not be "taking a settlement" but would be "trying the case to conclusion," informing defendant that "it's now out of your hands." Although these comments may have been intended merely to force defendant to make a decision as to settlement, they unquestionably had the effect of coercing defendant into agreeing to settle. The threatening nature of these remarks imposed impermissible pressure on defendant to settle. Thus, the settlement cannot stand and the judgment entered thereon must be vacated.
In reaching this decision, we are not unmindful of the fact that the trial court may well have become frustrated by defendant's failure to make a decision as to settlement and his insistence on questioning the terms of the settlement and his ability to satisfy the financial obligation imposed by those terms. We also appreciate the trial court's responsibility to conserve judicial resources and conclude trials expeditiously. Nonetheless, the trial court had a duty to exercise the highest degree of patience and forbearance with defendant, which it failed to do.
Finally, we recognize the importance of settlement and we in no way intend to discourage proper efforts by courts to guide parties toward settlement.[1] In this context, we deem it worthwhile to *279 repeat and reaffirm what the Third Circuit Court of Appeals aptly observed in Newton v. A.C. & S., Inc., supra, 918 F.2d at 1129:
Our decision is not intended to discourage the settlement of cases in appropriate circumstances and in an appropriate manner. In this age of burgeoning complex litigation and limited judicial resources, settlements are to be encouraged. Parties who contemplate or participate in settlement negotiations should, in their own interest and in the common interest of the efficient management of court calendars, extend themselves as much as they reasonably can in consummating settlements to accommodate court schedules. However, the court's efforts to expedite the settlement of cases must be consistent with the dictates of due process. Furthermore, these efforts should not unduly pressure or coerce litigants into settlement. [918 F.2d at 1129].
Accordingly, we reverse the orders under review, vacate the judgment of divorce and settlement incorporated therein, and remand the matter to the trial court to complete the trial based on the existing trial record, supplemented by such additional testimony and other evidence as the parties and the trial court may deem necessary for a full presentation of the contested issues. We direct that the matter be reassigned to another trial judge. Since we hold that the settlement was coerced, and that the judgment and settlement be vacated, there is no need to remand the matter to the trial court for a plenary hearing as to defendant's claim of lack of capacity to consent to the settlement.
NOTES
[1] We note that the trial court, perhaps with the best of intentions and albeit with the consent of the attorneys for both parties, held a pre-trial, ex parte conference with plaintiff in chambers during which it explored with her some of the financial issues involved and solicited her views as to what she "envisioned" would be a fair settlement. In our view, this practice is inappropriate and, except in the most extraordinary of circumstances, should not be employed by our trial courts, particularly in non-jury cases.