965 A.2d 209 (2009)
405 N.J. Super. 478
Albert DRAGON and Barbara Dragon, Petitioners-Appellants,
v.
New Jersey DEPARTMENT OF ENVIRONMENTAL PROTECTION, Land Use Regulation Program, and Edward W. Kelly, Jr., Respondents-Respondents.
DOCKET NO. A-5743-06T2
Superior Court of New Jersey, Appellate Division.
Argued January 29, 2009.
Decided March 6, 2009.
*212 Stephen Hankin, Atlantic City, argued the cause for appellants (Hankin, Sandman & Palladino, attorneys; Mr. Hankin, on the brief).
Lisa G. Daglis, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Daglis, on the brief).
John F. Spinello, Jr., Newark, argued the cause for respondent Edward W. Kelly, Jr. (K & L Gates, attorneys; Mr. Spinello, on the brief).
Before Judges PARRILLO, LIHOTZ and MESSANO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
This matter concerns the parameters of an administrative agency's discretion to settle a third-party permit challenge. Appellants Albert and Barbara Dragon (Dragons) are objectors to a settlement agreement between their next-door neighbor, respondent Edward W. Kelly, Jr. (Kelly), and the New Jersey Department of Environmental Protection (DEP), which authorized Kelly to tear down and reconstruct his oceanfront homeexpanding its size, height and footprintwithout a permit otherwise required under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, and its Coastal High Hazard Areas Rule (Coastal Rule), N.J.A.C. 7:7E-3.18. The Dragons appeal from the DEP's final decision upholding the settlement agreement, essentially arguing that the agency exceeded its authority under CAFRA by bypassing substantive CAFRA regulations and issuing approval in lieu of a permit. We agree.
Some background is in order. Kelly owns a 1950's oceanfront two-story single-family home with a 1944-square-foot footprint at 408 30th Street South in Brigantine, the most easterly lot on the block, and encroaching more oceanward than any of its neighbors. The entire lot, with ninety feet of ocean frontage and ninety-three feet deep, is located in the CAFRA Coastal High Hazard Area and the Federal Emergency Management Agency's "V10" Zone. The eastern, most oceanward portion of Kelly's lot consists of a thirty-foot by ninety-foot strip of vegetated dunes. A wooden timbered structure encased by timber pilings affixed with galvanized hardware, which appellants label a "bulkhead," separates this oceanward portion from the rest of Kelly's lot. Undeveloped land with vegetated dunes borders the lot to the north, south and east. There are no other houses or commercial buildings within 100 feet to the north and south of the lot. A public alleyway to the beach runs along the lot's southern boundary.
Since 1991, the Dragons owned the adjacent lot immediately west of Kelly's lot on the upland or non-water side, located at 404 30th Street South. Originally, the two properties had been under common ownership with Kelly's house being the only structure on the parcel. In 1981, the parcel was subdivided, and in 1988, a predecessor-in-title to appellants constructed what was to become the Dragons' house. Both lots have municipal sewer service.
In his first CAFRA permit application submitted in 2002 to DEP through its Land Use Regulation Program (LURP), Kelly requested a coastal general permit to demolish his existing house and build a new one, enlarging the height to three stories, or thirty-five feet, and increasing the house's footprint from 1944 to 3480 square feet. He also proposed extending *213 the footprint nine feet closer to his oceanfront lot line and eleven feet closer to the west lot line he shared with the Dragons (the original footprint was sixteen feet from appellants' lot). The setbacks on the north and south sides would be increased to twenty and ten feet, respectively.
The Dragons objected. DEP advised Kelly that his application would not likely be approved because there were no buildings within 100 feet of each of his north and south lot lines to qualify for exemption from the development ban of N.J.A.C. 7:7E-3.18. DEP, however, offered other options: (1) obtain a permit-by-rule under N.J.A.C. 7:7-7.2(a)(7) for voluntary reconstruction within the same footprint; (2) obtain a coastal general permit under N.J.A.C. 7:7-7.7 for reconstruction "landward of the existing footprint" with no enlargement of the footprint size and with no disturbance of any dune; or (3) obtain a coastal general permit under N.J.A.C. 7:7-7.7 for reconstruction "landward" and laterally north or south of the existing footprint with no enlargement of the footprint size and with no disturbance of any dune. Kelly could also obtain a permit-by-rule under N.J.A.C. 7:7-7.2(a)(1) for expansion, but not reconstruction, of his existing home up to 400 square feet on the non-water sides. Consequently, Kelly withdrew his application.
In 2004, Kelly submitted a second permit application with a similar proposal, this time increasing the footprint from 1944 to 2521 square feet. The Dragons again objected, citing destruction of scenic views, an inaccurate site plan, and the inappropriateness of a general permit for footprint enlargement. They argued that DEP should require a CAFRA individual permit for Kelly's project.
As a threshold matter, DEP found that Kelly had met the requirements to apply for a coastal general permit set forth in N.J.A.C. 7:7-7.9, which governs the waterward expansion or reconstruction (with or without expansion) of a single family home, and that Kelly did not need to apply for a CAFRA individual permit.[1] Nevertheless, DEP denied the permit because Kelly's property was entirely located within a coastal high hazard area and did not meet one of the exceptions to complying with the Coastal Rule, namely that a house or building be located within 100 feet of each of its northerly and southerly lot lines that run roughly perpendicular to the mean high water line. N.J.A.C. 7:7E-7.2(e)4(i)(3), (f)4(i)(3)[2]; N.J.A.C. 7:7-7.9(f)(l)iii. *214 On this score, DEP's Coastal Rule prohibits residential development in coastal high hazard areas unless all of the "infill development" standards in N.J.A.C. 7:7E-7.2(e) or (f) are satisfied. N.J.A.C. 7:7E-3.18(b). One of the criteria in both N.J.A.C. 7:7E-7.2(e) and (f) is that the development site had a house or commercial building within 100 feet of each of its lot lines running perpendicular to the mean high water line "measured outward from each lot line, along a line generally parallel to the mean high water line." N.J.A.C. 7:7E-7.2(e)4(i)(3) and (f)4(i)(3). Thus, Kelly's project was "not approvable" and could not be constructed.[3]
Kelly appealed, requesting an adjudicatory hearing before the Office of Administrative Law (OAL) or, in the alternative, requesting that the matter be referred to DEP's Office of Dispute Resolution.[4] Opting for the latter, DEP sent the matter for mediation and on September 30, 2004, DEP and Kelly reached an amicable resolution memorialized in a document entitled, "Mediation & Settlement Agreement In Lieu of a Permit" (settlement agreement or agreement), which allowed the reconstruction and expansion of the footprint of the existing single family dwelling on the Kelly property, subject to several conditions. Specifically, the agreement required Kelly: (1) to modify the proposed project "in a manner satisfactory to the Department and consistent with the Rules on Coastal Zone Management ... and the Coastal Permit Program Rules"; (2) to submit a revised site plan with a revised landscape plan "that represents an enhancement to the existing dune system"; (3) to offer and record a DEP-approved deed restriction "to prevent future encroachment waterward of the existing dune development restriction line"; (4) to obtain all other necessary local, state and federal permits; and (5) to allow DEP personnel access to the site as necessary for conducting compliance inspections.
DEP then published notice of the proposed settlement and solicited comments from interested parties. The Dragons filed objections and a separate appeal with DEP, contesting the agreement and requesting a hearing. Without responding to the hearing request, and after considering the Dragons' objection, DEP issued a "Letter of Authorization" (LOA) authorizing "the reconstruction and expansion of the footprint of [Kelly's] existing single family dwelling." Actually, the LOA approved Kelly's newly revised site plan, calling for the existing 1944-square-foot footprint to be increased to 2967 square feet, which was larger than proposed in Kelly's *215 application, and showing no setback from the so-called wooden "bulkhead" structure and a five-foot setback from the Dragons' lot. The LOA expressly stated that it was "in lieu of a Coastal General Permit, pursuant to the rules on Coastal Zone Management."
After the Dragons filed a notice of appeal challenging the LOA and DEP's failure to respond to their hearing request, the Commissioner issued an order granting their request for an adjudicatory hearing. On DEP's motion, we dismissed the appeal and the matter thereafter proceeded in the OAL where both DEP and the Dragons cross-moved for summary decision.[5] Following argument, the Administrative Law Judge (ALJ) set aside the settlement agreement and LOA as invalid and ultra vires, concluding that DEP, through its mediation process, waived the infill development rule without any express statutory or regulatory authority. In reaching his conclusion, the ALJ relied on SMB Assocs. v. New Jersey Dep't of Envtl. Prot., 264 N.J.Super. 38, 54-55, 624 A.2d 14 (App.Div.1993), aff'd, 137 N.J. 58, 644 A.2d 558 (1994), in which we concluded that waiver of a regulation could not be granted in the absence of a rule authorizing a waiver, and to do so would violate the rulemaking principles of Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984).[6]
In her final decision, the Commissioner adopted that part of the ALJ's initial decision finding that Kelly had properly applied for a coastal general permit as opposed to an individual permit. However, she rejected the ALJ's conclusion that the settlement agreement and LOA were invalid. Although the Commissioner acknowledged that Kelly failed to meet the third criteria for issuance of a coastal general permit, N.J.A.C. 7:7E-7.2(f)4(i)(3), she nevertheless found a "litigation risk" inherent in the denial of a permit, and therefore concluded that the settlement was a fair and reasonable exercise of DEP's discretion to resolve litigation, comported with the best interest of the environment, and was consistent with the purposes of CAFRA.
On appeal, the Dragons contend that the settlement agreement and LOA are ultra vires, arbitrary and capricious because they impermissibly allowed DEP to waive Kelly's compliance with the agency's substantive CAFRA regulations, specifically N.J.A.C. 7:7E-3.18(b), during its permitting process. Appellants also claim that DEP should have made Kelly apply for a coastal individual permit, instead of a coastal general permit, and that a remand is required for disposition of a bulkhead issue. We conclude that CAFRA does not give DEP either the express or implied power to authorize Kelly's proposed development in the coastal region in a settlement agreement "in lieu of", or in an authorizing letter "in lieu of", a formal permit.
*216 Our Supreme Court has established limitations on an administrative agency's waiver of its own regulations. "[A]n agency that seeks the power to waive its substantive regulations should adopt a regulation pertaining to any such waiver and setting forth appropriate standards to govern agency decision-making." In re CAFRA Permit No. 87-0959-5 Issued to Gateway Assocs., 152 N.J. 287, 308, 704 A.2d 1261 (1997).
To this end, in distinguishing between waiveable procedural regulations and nonwaiveable substantive regulations, we had previously identified Chapter 7 and Chapter 7E as separate chapters of CAFRA's Title 7. In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 312, 807 A.2d 198 (App.Div.2002). Chapter 7 (N.J.A.C. 7:7) contains the Coastal Permit Program (CPP) Rules, and Chapter 7E (N.J.A.C. 7:7E) contains the Coastal Zone Management (CZM) Rules. "[T]he CPP Rules contain the procedures for reviewing coastal permit applications and for enforcing violations. In contrast, the CZM Rules contain the substantive standards for determining development acceptability and the environmental impact of projects for which coastal permits are submitted." Ibid. Thus, the purpose of the procedural requirements in Chapter 7 is to implement the substantive standards in Chapter 7E.
N.J.A.C. 7:7-1.10 governs relaxation of CAFRA procedures and reconsideration of its substantive standards, and states:
(a) This chapter shall be liberally construed to effectuate the purpose of the Acts under which it was adopted.
(b) The Department may, in its discretion and if consistent with statutory requirements, relax the application of any of the procedures in this chapter when necessary and in the public interest.
(c) The Department may reconsider the application of one or more of the substantive standards in the rules on Coastal Zone Management at N.J.A.C. 7:7E, provided:

1. The Department has rendered a decision on a permit application under the substantive standards at N.J.A.C. 7:7E as strictly applied;
2. All administrative and judicial appeals of the permit decision have been concluded; and

3. Either of the following requirements is met:
i. A court has determined that the issuance, modification, or denial of a coastal permit would constitute a taking of property, and the property owner thereupon submits a request for a reconsideration of the application of a substantive standard of N.J.A.C. 7:7E; or
ii. A takings complaint has been filed with the court or the court has determined that the issuance, modification or denial of a coastal permit would constitute a taking of property, and the Department initiates the reconsideration.
[N.J.A.C. 7:7-1.10 (emphasis added).]
Clearly, while section (b) of N.J.A.C. 7:7-1.10 allows for relaxation of the procedural CPP Rules, such as N.J.A.C. 7:7-7.9, section (c) of N.J.A.C. 7:7-1.10 allows for waiver of the substantive CZM Rules, such as N.J.A.C. 7:7E-3.18 and 7:7E-7.2, only if strict guidelines are met and the waiver is necessary to avoid an unconstitutional taking of property. Here, there is no claim that DEP's permit denial was a takings, and since Kelly has not filed a takings complaint, the waiver provision of N.J.A.C. 7:7-1.10(c) is not implicated in this matter. Nor is any hardship exemption. Because Kelly had alternatives under which he could reconstruct *217 his home, it is unlikely he would be able to prove that strict application of the infill development rule would cause him extraordinary hardship of not realizing a minimum beneficial use of his property as a whole. See Littman v. Gimello, 115 N.J. 154, 164, 557 A.2d 314 (a taking "`substantially destroys'" beneficial use) (quoting Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n, 98 N.J. 258, 263, 486 A.2d 330 (1985)), cert. denied, 493 U.S. 934, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). Consequently, although DEP could "relax" N.J.A.C. 7:7-7.9 and other regulations in the CPP Rules during its review of Kelly's permit application, we conclude that DEP could not waive or "reconsider" application of the infill requirements of the CZM Rules in N.J.A.C. 7:7E-3.18 and 7:7E-7.2 to Kelly's proposed development during the permitting process.
DEP nevertheless argues that it has the inherent authority to deviate from strict compliance with its own regulations in order to avoid "litigation risks" and prevent exposure to potentially adverse legal determinations in a contested matter, pointing to New Jersey's strong public policy of favoring settlements. It cites to the specific litigation risk here of a court finding that the infill development rules of N.J.A.C. 7:7E-3.18(b) and 7:7E-7.2(e) and (f) do not apply to "reconstruction" or to lots already containing structures, such as Kelly's, but only to vacant, undeveloped oceanfront property.
We agree only with the portion of DEP's argument that posits the agency has the power to settle contested matters concerning CAFRA permit applications. Indeed, under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, "[u]nless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, or consent order." N.J.S.A. 52:14B-9(d). After all, "parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." Peskin v. Peskin, 271 N.J.Super. 261, 275, 638 A.2d 849 (App. Div.) (quoting Dep't of Pub. Advocate v. N.J. Bd. of Pub. Utils., 206 N.J.Super. 523, 528, 503 A.2d 331 (App.Div. 1985)), certif. denied, 137 N.J. 165, 644 A.2d 613 (1994). Accord Brundage v. Estate of Carambio, 195 N.J. 575, 601, 951 A.2d 947 (2008). More to the point, N.J.S.A. 13:19-17 gives DEP the power to "adopt rules and regulations to effectuate [CAFRA]." To this end, DEP set up a formal settlement process in response to a hearing request on a permit decision. N.J.A.C. 7:7-5.4.
We are not persuaded, however, that DEP was actually faced with the "litigation risk" it suggests. Despite Kelly's insistence that the infill development rules do not apply, his proposed project clearly fails to meet the express language of the exceptions in N.J.A.C. 7:7E-7.2(e) or (f) to prevent the prohibition of development in N.J.A.C. 7:7E-3.18(b). Indeed, even the Commissioner found that Kelly's proposed project would not meet the 100-foot infill development requirement in N.J.A.C. 7:7E-7.2, and therefore denied Kelly's second permit application in two years.
Even if DEP had correctly assessed its litigation risk, the issue here concerns not the agency's power to enter into settlement negotiations, which no one disputes, but rather whether DEP's use of the settlement process to circumvent CAFRA's substantive permitting requirements and to allow regulated development in a coastal region governed exclusively by CAFRA is authorized by that governing statute. We conclude CAFRA does not grant such authority to DEP, either express or implied.
To be sure, "court-fashioned doctrines for the handling of litigation [i.e., *218 settlements] do in fact have some genuine utility and relevance in administrative proceedings." City of Hackensack v. Winner, 82 N.J. 1, 29, 410 A.2d 1146 (1980). In applying such mechanisms, consideration is given to "an administrative agency's statutory foundations, its executive nature, and its special jurisdictional and regulatory concerns." Ibid. Indeed, agencies are accorded "wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction." Metromedia, supra, 97 N.J. at 333, 478 A.2d 742.
"Administrative agencies possess the ability to be flexible and responsive to changing conditions." Texter v. Dep't of Human Servs., 88 N.J. 376, 385, 443 A.2d 178 (1982). "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid. In that regard, "[a]n agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty." Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137, 770 A.2d 233 (2001). The choice rests within the agency's discretion, and courts generally defer to that choice so long as it "is responsive to the purpose and function of the agency." Texter, supra, 88 N.J. at 385-86, 443 A.2d 178.
By the same token, the statutory grant of power by the Legislature to an agency can either be express or implied. James v. Bd. of Trs. of Pub. Employees' Ret. Sys., 164 N.J. 396, 404-05, 753 A.2d 1061 (2000); N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-62, 384 A.2d 795 (1978). "[C]ourts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." N.J. Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795. Thus, in determining whether an administrative act enjoys statutory authorization, the reviewing court may look beyond the enabling act's specific terms "to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." Ibid. Declarations of public policy in enabling legislation can also serve as sources of statutory authorization for regulations aimed at pursuing that policy. In Review of Admin. of Health Care Admin. Bd. v. Finley, 168 N.J.Super. 152, 162, 402 A.2d 246 (App.Div.1979), aff'd, 83 N.J. 67, 415 A.2d 1147, cert. denied, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980).
However, an agency may not give itself authority not legislatively delegated. Cooper Univ. Hosp. v. Jacobs, 191 N.J. 125, 141, 922 A.2d 731 (2007). The manner in which the agency exercises its discretion in choosing an appropriate procedure may be governed by the procedural requirements of the APA. Metromedia, supra, 97 N.J. at 333-34, 478 A.2d 742; St. Barnabas Med. Ctr. v. N.J. Hosp. Rate Setting Comm'n, 250 N.J.Super. 132, 143, 593 A.2d 806 (App.Div.1991). In the final analysis, it is the court's function to interpret an agency's enabling statute to determine whether the agency's actions are consistent with the policy established by the Legislature or exceed the scope of the agency's jurisdiction. Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973); Swede v. City of Clifton, 22 N.J. 303, 312, 125 A.2d 865 (1956). On this score, a court is not bound by the agency's legal conclusions. Mayflower, supra, 64 N.J. at 93, 312, A.2d 497; Levine v. State, Dep't of Transp., 338 N.J.Super. 28, 32, 768 A.2d 192 (App.Div.2001).
In enacting CAFRA, the Legislature found
that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing *219 development activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State.
[N.J.S.A. 13:19-2.]
The Legislature balanced its desire to address the adverse environmental effects of coastal area development with recognized economic considerations for those who inhabited the coastal areas, noting CAFRA was intended to also
encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the coastal area.
[Ibid.]
Thus, each agency decision involving a permit application for development under CAFRA invokes these "competing policy considerations." In re Cape May County Mun. Utils. Auth., 242 N.J.Super. 509, 516, 577 A.2d 840 (App.Div.1990).
At its heart, CAFRA expressly requires that any development within the State's specified "coastal area" either (1) be conducted under a permit issued pursuant to N.J.S.A. 13:19-5 or -5.1, or (2) be an activity that is explicitly exempted from the permitting requirement by N.J.S.A. 13:19-5.2 or -5.3. As already noted, coastal permits may be either individual or general. As to the former, which are regulated under N.J.A.C. 7:7-2.1, N.J.S.A. 13:19-5 states in part that a CAFRA permit shall be required for:
b. A development located in the coastal area between the mean high water line of any tidal waters, or the landward limit of a beach or dune, whichever is most landward, and a point 150 feet landward of the mean high water line of any tidal waters or the landward limit of a beach or dune, whichever is most landward, that would result, either solely or in conjunction with a previous development, in:
(1) A development if there is no intervening development with an above ground structure, excluding any shore protection structure or sand fencing, that is either completed or under active construction between the proposed site of the development and the mean high water line of any tidal waters[.]
"`Development' means the construction, relocation, or enlargement of any building or structure ..., and shall include residential development, commercial development, industrial development, and public development[.]" N.J.S.A. 13:19-3. "`Residential development' means a development that provides one or more dwelling units." N.J.S.A. 13:19-3.
DEP also has the power, under N.J.S.A. 13:19-5.1, "to issue a general permit in lieu of a [CAFRA] permit":
Notwithstanding any other provision of law, rule or regulation to the contrary, the commissioner is authorized to issue a general permit in lieu of a permit issued pursuant to section 5 of P.L. 1973, c. 185 (C. 13:19-5). The department shall adopt rules and regulations which identify the activities subject to general permit review, and which establish the criteria for the approval or disapproval of a general permit issued pursuant to this section. The department shall approve, approve with conditions, or disapprove an application for a general permit pursuant to this section in accordance with P.L. 1975 c. 232 (C. *220 13:1D-29 et al.) [An Act concerning the application for construction permits to the Department of Environmental Protection, supplementing the "Department of Environmental Protection Act of 1970"].
[(emphasis added).]
Coastal general permits are regulated under various subsections of N.J.A.C. 7:7-7.
There are, however, notable statutory exceptions to the reach of CAFRA's permit requirements. In this regard, N.J.S.A. 13:19-5.2 lists various activities for which "[a] permit shall not be required." These activities include: (1) "[t]he reconstruction of any development that is damaged or destroyed," N.J.S.A. 13:19-5.2(b); (2) "[t]he enlargement of any development" if that enlargement does not enlarge the footprint of the development, N.J.S.A. 13:19-5.2(c); and (3) "[t]he construction of a patio, deck or similar structure at a residential development," N.J.S.A. 13:19-5.2(d). Also, N.J.S.A. 13:19-5.3 allows DEP to "waive the permit requirement for development in the coastal area ... for any development that involves the grading or excavation of a dune by a governmental agency."
None of these statutory exceptions to the CAFRA permitting requirements apply here. Moreover, nothing in CAFRA authorizes DEP to allow development in the coastal region by way of a "letter of authorization ... in lieu of a Coastal General Permit" or in a "Settlement Agreement In Lieu of a Permit." Nor can that power be reasonably implied by the statutory scheme, even if other conditions safeguarding the environment are attached to the agency's authorization.
Although not specifically contemplated by CAFRA, DEP also allows development under a permit-by-rule. N.J.A.C. 7:7-7.1(a). Permits-by-rule are essentially the exercise of DEP's implied power under CAFRA to allow development that will have minimal potential for environmental impact. For example, CAFRA permits-by-rule can be used for: (1) expansion of a single-family home on the non-waterward side, provided the expansion is no more than 400 square feet and the project is not on a dune, wetland or beach, N.J.A.C. 7:7-7.2(a)(1); and (2) voluntary reconstruction if the structure is non-damaged and occurring within the existing footprint, N.J.A.C. 7:7-7.2(a)(7). Indeed, for these activities, notification to DEP is not required and no formal "permit" review or authorization is issued. N.J.A.C. 7:7-7.2(c). Kelly's proposed development, however, is not an activity covered under this permit-by-rule provision, N.J.A.C. 7:7-7.2.
Thus, pursuant to CAFRA's express language and any implied authority conferred on DEP thereunder, there are only two avenues open to an applicant for development governed by CAFRA: (1) apply for and receive a permit pursuant to N.J.S.A. 13:19-5 or -5.1; or (2) propose development that is expressly exempted or excluded from the statutory scheme or will have minimal impact to the environment, such as rebuilding in the same footprint pursuant to N.J.S.A. 13:19-5.2 or -5.3. Here, the settlement agreement and LOA, both in lieu of a coastal general permit that was in fact originally denied by the agency as not meeting the requisite regulatory requirements, do not satisfy either of those categories, and are therefore statutorily unauthorized.
It matters not, in our view, that DEP eventually issued a so-called "Compliance Report," finding that Kelly's proposal met all of CAFRA's criteria in N.J.S.A. 13:19-10(a)-(g) for issuance of a permit. This report was issued on July 11, 2005, ten months after DEP executed the settlement agreement, seven months after it issued the LOA, and six months after the Dragons *221 had filed their first notice of appeal. In any event, the belated agency findings of compliance with N.J.S.A. 13:19-10 simply do not equate with the formal issuance of a permit, especially since DEP never addressed therein the applicability of either N.J.A.C. 7:7E-3.18(b) or N.J.A.C. 7:7E-7.2(e) or (f).
Nor does the case law relied upon by DEP support its position here. None of the published precedent addresses the validity of a DEP settlement agreement or LOA "in lieu of a permit" granted under the auspices of CAFRA. Instead, the cases relate to either hardship waivers, N.J.A.C. 7:7-1.10(c)(1)-(3), or other statutory schemes, In re New Jersey Pinelands Comm'n Resolution, 356 N.J.Super. 363, 365-67, 812 A.2d 1113 (App.Div.), certif. denied, 176 N.J. 281, 822 A.2d 610 (2003), and none involve agency approval of development in environmentally sensitive areas, see e.g., Ocean County Chapter Inc. of Izaak Walton League v. Dep't of Envtl. Prot. & Energy, 303 N.J.Super. 1, 9-10, 696 A.2d 25 (App.Div.1997); E.I. du Pont de Nemours & Co. v. State, Dep't of Envtl. Prot. & Energy, 283 N.J.Super. 331, 340, 661 A.2d 1314 (App.Div.1995), or approval of development after formal agency denial. In re New Jersey Pinelands Comm'n Resolution, supra, 356 N.J.Super. at 365-67, 812 A.2d 1113.
We do not suggest in any way limitations on DEP's ability to enter into a settlement agreement to resolve many of the sundries affecting a permit, such as modifications and conditions, so long as the agency's actions do not waylay its eventual "permit" authorization. In fact, settlement negotiations may result in a "permit" being issued. N.J.A.C. 7:7-5.4(e). However, except for the listed exceptions to CAFRA's permit requirements in N.J.S.A. 13:19-5.2 and -5.3, the Legislature made the "permit" authorization key to allowing development in the coastal region. Accordingly, we hold that DEP lacked the authority, express or implied, to issue a LOA based on an executed settlement agreement "in lieu of a [CAFRA] permit."
In light of our disposition, we need not determine the remaining issues raised by appellants, namely whether Kelly properly applied for a coastal general permit as opposed to an individual permit, and whether the wooden structure on Kelly's lot is a "bulkhead" requiring a twenty-five-foot setback under N.J.A.C. 7:7-7.9(m)(2) and 7:7E-3.18(f). As to the former, we simply note that upon reapplication for a permit, Kelly might change his proposed development either to satisfy the CZM and CPP Rules, or obviate the need for any formal permit altogether by reconstructing his house in the same footprint (and simply increasing the height) or by expanding his existing house landward. See N.J.A.C. 7:7-7.2(a)(1) and (7) (permits-by-rule). As to the latter, the same consideration, of course, applies, together with the fact that the "bulkhead" issue was not preserved for appeal, Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973), having never been raised in appellants' initial exceptions to the ALJ's decision nor presented to the Commissioner.
Reversed.
NOTES
[1] DEP's Coastal Permit Program, N.J.A.C. 7:7-1 to -10, authorizes only one general permit for any reconstruction after 1994 on contiguous lots which were in common ownership after 1973. N.J.A.C. 7:7-2.1(b)8ii; N.J.A.C. 7:7-7.9(b). The Kelly and Dragon properties come within this provision. Because both of their houses had been constructed and "legally existing" before the 1994 enactment of CAFRA's amendment applying the statutory scheme to single family residential dwellings not part of a larger development greater than twenty-four units, Kelly's project would result in the first regulated CAFRA development. As such, Kelly's proposed expansion was not in conjunction with any "previous development" as defined by N.J.A.C. 7:7-2.1(b)(8), and was therefore eligible for a coastal general permit under N.J.A.C. 7:7-7.9. Correspondingly, when a development or expansion of an existing development may be considered to be "in conjunction with a previous development," a CAFRA individual permit must be obtained. N.J.A.C. 7:7-2.1(b)(8).
[2] According to N.J.A.C. 7:7E-7.2(e) and (f), development does not have to comply with the coastal high hazard rule if:

(1) the lot was shown as a subdivided lot prior to July 19, 1993; (2) the lot is served by a municipal sewer system; and (3) a house or commercial building is located within 100 feet of each of the lot lines that run roughly perpendicular to the mean high water line.
It is undisputed that Kelly's proposed reconstruction satisfied the first two criteria. DEP found, however, that because "there is no house or commercial building located within 100 feet of each of the subject lot lines that run roughly perpendicular to the high mean water line," Kelly's proposed project did not meet the standards necessary for an exemption under N.J.A.C. 7:7E-3.18(b).
[3] Nevertheless, DEP told Kelly that, as "[a]n alternative to the proposed project," he could expand his existing house "on the non-waterward side of the dwelling, which does not exceed a cumulative surface area of 400 square feet." DEP also noted that the rules could be "relax[ed]" if Kelly could demonstrate that "an extraordinary hardship" existed as defined in N.J.A.C. 7:7-1.10.
[4] The Office of Dispute Resolution, according to N.J.A.C. 7:1-1.2(d)(2), which governs DEP organization, "provides a forum other than the administrative and trial courts for resolution of disagreements between affected parties and [DEP] regarding Departmental actions." It "employs alternative dispute resolution processes, primarily mediation, and acts as an impartial third party to assist affected parties and [DEP] in reaching a joint resolution of the issue(s) and agreeing on a future course of action." N.J.A.C. 7:1-1.2(d)(2).
[5] In a footnote in their motion brief, the Dragons excluded from consideration the "fact-sensitive" bulkhead issue because of disputed facts.
[6] The ALJ upheld DEP's determination that Kelly was required to apply for a general permit under CAFRA as opposed to an individual permit, reasoning that the type of permit required for the proposed project is a procedural matter and, as such, within DEP's discretion to determine the appropriate permit required under CAFRA. The ALJ, however, did not dispose of the Dragons' remaining argument that DEP failed to apply, and thus the settlement agreement does not consider, still another nonwaiveable substantive regulation requiring Kelly's development to setback 25 feet from his bulkhead. This involves a material factual dispute regarding whether a structure on Kelly's lot is a bulkhead.