**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2675-19

KAYVAN KAROON,[1]

    Plaintiff-Respondent,

v.

LISA KAROON,

    Defendant-Appellant.

_____

> Submitted April 12, 2021 – Decided May 7, 2021
>
> Before Judges Rothstadt and Mayer.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1549-19.
>
> Belsole & Kurnos, LLC, attorneys for appellant (Kevin Weinman and Roy E. Kurnos, on the briefs).
>
> Arons & Solomon, PA, attorneys for respondent (Marion B. Solomon and Patricia L. Burris, on the brief).

PER CURIAM

---

[1] Various court orders misspelled plaintiff's name as "Kavon."

Defendant Lisa Karoon appeals from a January 29, 2020 order denying her motion to set aside a marital settlement agreement (MSA) and a February 20, 2020 order awarding fees and costs to counsel for plaintiff Kayvan Karoon. We affirm.

The facts are based on the testimony and documentary evidence presented during a January 16, 2020 plenary hearing.

Plaintiff and defendant decided to divorce after nineteen years of marriage. Prior to filing a divorce action, the couple separated and executed the MSA. Neither party had counsel during the negotiation and execution of the MSA. Philip Guarino, an attorney who represented plaintiff's regarding his business interests and defendant in various personal legal situations, mediated the matter and prepared several drafts of the MSA, as well as the July 12, 2018 final MSA, a September 7, 2018 addendum to the MSA (addendum), and a September 19, 2018 Share Transfer Agreement.

On January 11, 2019, plaintiff filed a complaint seeking dissolution of the marriage on the grounds of irreconcilable differences. Defendant acknowledged service of the complaint on January 30, 2019, but did not file an answer, resulting in the entry of default against her. On February 25, 2019, the parties signed and filed a "final judgment of divorce on consent."

2

In April 2019, believing she was required to hire an attorney to proceed with the divorce, defendant retained counsel. On August 9, 2019, defendant's attorney filed a motion to set aside the default, file an answer and counterclaim, and extend the time to file a responsive pleading. She also contested the validity of the MSA, addendum, and Share Transfer Agreement. The judge entered an order setting aside the default and scheduled a plenary hearing to determine the enforceability of the MSA and related documents.

I.

At the plenary hearing, the judge heard testimony from three witnesses: plaintiff, defendant, and Guarino. He also admitted as evidence certain documents proffered by the parties during the hearing. The judge listed the documents he considered in his written decision.

A. <u>Defendant's testimony</u>

At the time of the hearing, defendant was sixty-one years old and lived with her mother in South Carolina. In South Carolina, she worked as "a personal assistant for elderly people" at a rate of about twenty dollars per hour, six hours per day, and five days per week, grossing approximately one thousand dollars monthly. As a breast cancer survivor, defendant worked to qualify for health

3

insurance and explained she required insurance based on the potential for a cancer recurrence and other health issues.[2]

Defendant explained plaintiff owns a financial securities business and "invests people's money in stocks and bonds." Prior to owning his own business, plaintiff worked as a financial advisor for various companies. At plaintiff's request, defendant never worked during the marriage. Defendant stayed home and cared for the parties' son, who was born in 1998. According to defendant, the parties discussed divorce several times during the marriage. Plaintiff threatened divorce in 2013, 2014, and 2015. In 2015, defendant claimed plaintiff threatened to kill her before packing his bags, leaving the marital home, and stating his intent to retain a divorce lawyer. However, plaintiff soon returned to the marital residence, expressing a desire to resolve the couple's marital issues.

---

[2] Defendant offered no testimony regarding her current cancer status. Nor did she provide testimony regarding her other health issues. Plaintiff testified defendant had a bilateral mastectomy and reconstructive surgery in 2006 and, as of the January 2019 hearing date, he was unaware of any cancer recurrence suffered by defendant.

The couple remained together until March 2018. At that time, defendant requested a divorce because she could no longer live in a stressful environment and stress exacerbated her health condition.

Defendant testified it was plaintiff who suggested using Guarino to mediate issues related to the dissolution of the marriage. The suggestion was based on the parties' awareness of the emotional and financial costs associated with divorce.[3] Defendant agreed to retain Guarino because she "wanted it to be civilized, fair and balanced and [to] keep it simple for [her] son and not stress him out."

Defendant told the judge she could not remember her first in-person meeting with Guarino, who lived in France. Defendant believed the two met face-to-face in "either April or May" and the meeting focused on signing the MSA so the marital home could be sold by June 2018. Defendant felt pressured to sign the MSA but did so because the house could not be listed for sale until the document was signed.

The marital home had a mortgage of $310,000. The house and mortgage were in defendant's name to protect the asset from lawsuits related to plaintiff's

---

[3] The parties were acutely aware of the toll placed on divorcing families having experienced plaintiff's parents' divorce. Defendant testified plaintiff financed his parents' divorce, incurring nearly $500,000 in legal fees.

A-2675-19

business.[4] The parties used marital funds for the down payment and all home repairs during the marriage.

Prior to signing the MSA, the parties met with Guarino at plaintiff's office. Defendant could not remember the exact date but recalled Guarino presented a written agreement at that meeting. Defendant indicated plaintiff and Guarino discussed the agreement prior to signing.

Defendant recollected reading a provision in the MSA waiving alimony. She questioned the provision, stating her entitlement to alimony based on the length of the marriage. Guarino purportedly responded plaintiff was unwilling to pay alimony. Defendant also claimed to have discussed alimony with plaintiff and he responded there was "no way [she was] going to get alimony."

Defendant also told plaintiff and Guarino she was entitled to an interest in plaintiff's business because she held shares in the business. Guarino explained plaintiff's business had no value other than plaintiff's sweat equity.

Before meeting in-person, defendant spoke with Guarino on the telephone. During defendant's direct examination, the judge asked defendant about when

---

[4] Defendant testified all marital assets, including bank accounts, were in her name to protect the assets from creditors seeking to recover money judgments against plaintiff and plaintiff's business.

she first began interacting with Guarino. Defendant could not remember dates or specifics regarding her discussions with Guarino.

Guarino stayed with the parties in the marital home for a several days before the MSA was signed. Defendant said a face-to-face meeting took place in plaintiff's office in "March or April" contrary to her earlier testimony that the meeting occurred in "April or May."

Despite her inability to recall specific details, defendant testified she had "five minute[] or ten minute" conversations with Guarino, while he was still in France, regarding the draft MSA. She also acknowledged six or seven drafts of the MSA were prepared, and Guarino made changes to the document at her request, including provisions related to the existing car leases, health insurance, and plaintiff's inheritance. Prior to signing the MSA, defendant told Guarino several times she "didn't like what [she] saw" in the draft document.

The judge inquired if defendant spoke with Guarino on the telephone prior to the face-to-face meeting or at any other time and, if so, when. Defendant responded Guarino "could have called me up and it could have been on the phone," but she could not recall any specific telephone discussions with the mediator. According to defendant, her memory is affected by her cancer

treatment and she is unable to remember "intimate details on the date and the time."[5]

Defendant did not retain counsel to review the MSA because she lacked funds to hire a lawyer. Although the couple's bank accounts were solely in her name, defendant testified she would "never t[ake] money freely on [her] own for fear of [plaintiff's] behavior or treatment or what would happen to [her] if [she] did." Defendant feared for her life "[b]ecause [plaintiff] threatened . . . in December of 2015 that if [she] ever called his mother he would kill [her]." Defendant also explained when plaintiff became upset with her during the marriage, he canceled her credit cards, turned off her cell phone, and harassed and bullied her. Additionally, because she was occupied with caring for the home and packing in anticipation of moving to South Carolina, defendant was too stressed to hire a lawyer. According to defendant, neither plaintiff nor Guarino suggested she speak with an independent legal or financial professional regarding the MSA.

---

[5] Throughout the hearing, defendant frequently failed to respond to the question presented, including questions posed by the judge. Also, defendant's responses often presented information she wished to impart to the judge rather than answering the specific question, including questions asked by her own attorney.

Throughout her testimony, defendant reiterated feeling constant pressure and stress regarding the MSA. She emphasized Guarino never reviewed the MSA with her and, as a result, she failed to understand her legal rights throughout the mediation process.

Regarding the sale of the marital home, the MSA provided the home was "to be sold and the proceeds divided equally." In 2018, the remaining mortgage amount owed on the home was $310,000. Originally, the home was listed for sale at $700,000 and subsequently reduced to $680,000. There was an interested buyer at the reduced price, but the buyer failed to tender the deposit money to proceed with the purchase and no offer was consummated.

According to defendant, instead of selling the marital home, plaintiff offered to buyout her interest in the home for $240,000 upfront and pay an additional $10,000 one year later. Defendant was unhappy with the proposed amount based on the lack of alimony and her financial share of plaintiff's business. Despite these misgivings, defendant signed the MSA because plaintiff threatened to make her life "very miserable" if she declined.

Defendant received the agreed upon money from plaintiff, explaining "[t]he money was already sitting there in [her] name in the bank all along." The judge asked whether the money used to pay defendant came from funds

9

belonging to defendant, to plaintiff, or both parties. Defendant maintained she was paid from her own money in the couple's bank accounts. When cross-examined on the issue, defendant explained the account from which the payment was made contained mixture of marital funds from "a long time ago," a settlement on the marital home, and "some money added into the account that was in France."

After the transfer of the home, defendant moved to South Carolina. Defendant used $72,000 of the money she received from plaintiff to pay off the mortgage on her mother's South Carolina home and add her own name to the deed. When she left the marital home, defendant took personal belongings, furniture, and artwork.

Defendant described her relationship with Guarino, referring to herself as a "serv[ant]" because she cooked and cleaned during Guarino's visits to New Jersey. When asked about Guarino's personal representation of her in various legal matters, defendant stated all communications were conducted through plaintiff. Defendant conceded she wanted "to spend as little as possible on the divorce," and paid no money to Guarino for his services.

Defendant continued receiving money from plaintiff during the pendency of the divorce and after the divorce. Pursuant to the Share Transfer Agreement,

defendant received $200 bi-weekly from September 2018 through the end of 2018. In addition, plaintiff allowed defendant to use his credit card, up to $800 per month, until the divorce was final. Plaintiff paid more than $10,000 for defendant's move to South Carolina. He also paid her cell phone bills and health insurance and continues to do so. Further, plaintiff paid $2,500 for defendant to retain her attorney and $48,0000 for the parties' 2018 tax obligation. Significantly, defendant bore no expenses associated with her son. All expenses associated with the parties' child are paid by plaintiff.

Defendant testified plaintiff lacked the ability to use his right arm as a result of a motorcycle accident. She also acknowledged plaintiff suffered from periodic stomach blockages, requiring past, and anticipated future, hospitalization. Despite these limitations, defendant stated plaintiff could work and "never saw him sickly."

Defendant also described the marital lifestyle. The parties lived in a four-bedroom home, which they renovated during the marriage. Defendant testified the house was located on a "very nice-sized lot" in a "beautiful neighborhood with a good school system." During the marriage, the parties drove luxury cars, traveled, and dined at restaurants. According to defendant, money was never an issue during the marriage.

11

Defendant also described her lifestyle since moving to South Carolina, where she lives in a two-bedroom home with her mother. The home is located in a gated community with various amenities, including a clubhouse, golf course, and restaurant. Since moving to South Carolina, defendant has taken very few trips and lacks her own car. Defendant uses her mother's luxury car for transportation. Due to health limitations, defendant testified she is unable to work more than six hours per day, five days per week.

B. Guarino's testimony[6]

Since 1982, Guarino has been licensed to practice law in New Jersey. At the time of the hearing, he worked as a solo practitioner. Guarino first met plaintiff while representing plaintiff's interest in a commercial lease dispute. He met defendant through plaintiff and socialized with the couple. In addition to representing plaintiff, Guarino represented defendant in various legal matters, including an estate planning matter for defendant's mother. He also represented the parties' son in legal matters. According to Guarino, he was the parties'

---

[6] Because Guarino resides in France, he testified telephonically. Prior to his testimony, both parties confirmed the voice on the telephone belonged to Guarino.

A-2675-19

"family attorney" and occasionally stayed with them when he was in the United States. Guarino considered plaintiff and defendant to be his friends.

Guarino learned about the divorce from the parties and offered to help "in any way," eventually acting as a mediator and drafting the MSA. Guarino served as a mediator "voluntarily for no compensation" and did not request the parties sign a written agreement for his services.

Guarino testified he acted as a "neutral" and helped defendant, addressing issues directly with her. He ensured additional safeguards for defendant's benefits were incorporated into the revised versions of the MSA. Guarino explained his role to both parties, stating he would act as the mediator and would not provide legal advice to either party.

Prior to his involvement, Guarino told the judge the parties previously agreed on a "large game plan," including the following: equal division of the marital assets; "no alimony because [plaintiff] ha[d] handicaps and didn't think that he could go on working forever"; and equitable distribution of plaintiff's inheritance. Guarino explained he dealt with "details such as car leases, insurance, and that kind of thing." Based on his understanding of the parties' agreed upon terms, Guarino prepared a first draft of the MSA.

13

Guarino testified he "went through the [a]greement with [defendant] at length explaining the various provisions . . . noted her concerns, [and] spoke to [plaintiff] about the concerns." Her concerns were then "incorporated in a subsequent draft" of the MSA. Guarino "specifically recall[ed] spending quite a bit of time with [defendant]," communicating with her in person and on the telephone "to make sure she understood." He "spent a lot of time trying to address [defendant's] concerns and going through the [a]greement and the drafts of the [a]greement and explaining to her clause by clause what everything meant to make sure she understood and what was in agreement." According to Guarino, "it was always understood [defendant] wasn't getting alimony," and she never mentioned alimony to him until she retained an attorney more than six months after signing the documents.

Based on their communications, Guarino testified defendant understood the terms of the MSA. Guarino told the judge he wanted "to make sure she was comfortable with it and understood everything and that she thought it was fair and that her concerns were allayed, which [he] thought they had been."

Regarding plaintiff's business, Guarino testified defendant "would relinquish her shares in the company" because plaintiff believed defendant "had no interest in remaining involved with the business" and she was not involved

14

in the business during the marriage. Guarino explained the business's value was limited to plaintiff's sweat equity because "[w]ithout [plaintiff] toiling away and working, it [wa]s worth nothing." According to Guarino, the business lacked employees, receivables, inventory, and assets. Guarino prepared the Share Transfer Agreement, relinquishing any interest defendant had in plaintiff's business. In return, defendant received $200 bi-weekly from September 2018 through the end of the year.

Guarino testified he was not present when the parties signed the MSA.[7] After the parties signed the MSA, Guarino's involvement as the mediator continued and he drafted the addendum. Guarino was not privy to the parties' negotiations regarding the sale of the house but was told after-the-fact about plaintiff's plan to purchase defendant's share of the home. Guarino discussed the matter with defendant and inserted a clause in the addendum to protect her "which basically said that if any payment w[as] [sixty] days late, [plaintiff] would have to immediately cure the arrearage or be obligated to immediately sell the home and use the proceeds to pay off the mortgage."

---

[7] However, both defendant and plaintiff testified Guarino was present and ran "back and forth between" the parties to discuss the MSA prior to them signing the document.

A-2675-19

When he learned defendant sought to set aside the MSA, Guarino spoke with both parties in an effort to resolve the matter. According to Guarino, plaintiff "was adamant [he and defendant] had an agreement" and believed defendant was experiencing "emotional issues." Guarino was unsuccessful in resolving the parties' dispute and concluded the "major" issue involved the payment of alimony.

When asked whether he acted impartially as the mediator, Guarino answered affirmatively, indicating there were no issues until April 2019 when defendant retained an attorney. To demonstrate his impartiality, Guarino explained he spent most of his time addressing and reviewing the drafts of the agreement with defendant, "explaining to her clause by clause what everything meant to make sure she understood" the MSA.

When asked about his prior mediation experience, Guarino testified it was his first divorce mediation. However, he told the judge he was "no novice," was "aware of matrimonial law," and previously worked on a divorce case.

Because he was familiar with the parties' financial circumstances, Guarino did not require the parties to submit a Case Information Statement. He explained the court rules did not require submission of a Case Information Statement to participate in mediation. Guarino was questioned at length regarding the

16

couple's finances and reaffirmed defendant's entitlement to $250,000 under the MSA.

Regarding alimony, Guarino opined defendant was not entitled to alimony because plaintiff was handicapped and, in recent years, earned approximately $70,000. Guarino testified defendant received one half of the parties' assets and plaintiff's inheritance. He also noted defendant was not obligated to pay any child support or contribute to college tuition for her son. He denied telling defendant there was no way she would ever receive alimony because "it was clear from day one in the [a]greement that there was no alimony" and defendant "understood that." Guarino also explained to defendant why there was no value to plaintiff's business. Further, he testified defendant never told him she feared plaintiff or felt forced to sign the MSA.

Contrary to defendant's testimony, Guarino noted there was no time constraint related to signing the MSA. To the contrary, negotiations "dragged on and dragged on," far exceeding the time Guarino anticipated when offering to assist the parties in dissolving the marriage.

Guarino reiterated notifying both parties he was not their independent attorney, and they could retain counsel. In fact, he cited Paragraph 25 of the MSA, which provided:

The parties acknowledge and understand that Mr. Guarino represents neither of them with respect to their domestic dispute and the settlement thereof and that he has acted solely in the role of a mediator. Both during this mediation process and upon completion of the mediation, the parties acknowledge being strongly advised by such mediator to obtain independent legal advice and review of this Marital Settlement Agreement before signing it. The parties understand that they are under no obligation to sign this Agreement at this or any other time and that they can take any extra time desired for additional consultation with independent legal counsel regarding the legality and effect of this Agreement.

C. Plaintiff's testimony

According to plaintiff, when the parties first discussed divorce, defendant requested half of the house and other items, including payment of her health insurance. She also expected plaintiff to continue working despite his declining health and injuries he suffered in a motorcycle accident.[8] Plaintiff explained his ability to continue working is limited as a result of his deteriorating health.

---

[8] Plaintiff suffered internal injuries in the motorcycle accident. Those injuries required seven post-accident surgeries. Anticipating a continued need for surgeries, the doctors inserted a mesh to cover a twelve-inch hole in plaintiff's abdomen. Since implantation of the mesh, plaintiff experienced regular intestinal blockages, requiring six hospitalizations. To return his abdomen to normal, plaintiff requires surgery to remove the mesh. He elected to delay the surgery based on the length of time required for recovery and the reduced success rate for such surgery.

Plaintiff testified marital stress contributed to his declining health and his doctor suggested the parties attend marriage counseling. However, defendant refused to participate in marriage counseling and requested a divorce. According to plaintiff, defendant even asked, "when is [Guarino] going to get the papers?"

Plaintiff then sent an email to Guarino with the basic divorce terms and received a draft MSA a few days later. According to plaintiff, defendant went back and forth discussing the MSA for about two months until the document was signed in July 2018. Plaintiff did not consult an attorney prior to signing the MSA and did not seek or receive legal advice from Guarino.

Subsequent to signing the MSA, the parties listed the marital home for sale. After reducing the asking price to $680,000, there was only one offer to purchase the home, which fell through. As a result, plaintiff decided to buy the house and gave defendant an offer of $250,000, explaining that was the amount she would have received "between the cash and the equity in the house" minus a $10,000 discount. Plaintiff explained his calculation assumed the house was worth $680,000 despite comparable home sales on Zillow at the time, indicating the house was worth between $580,000 and $590,000.

19

Upon conveyance of the house, defendant immediately left New Jersey and took everything, including "the butter tray out of the fridge." Plaintiff admitted telling defendant she could take whatever she wanted from the house.

Regarding Guarino, plaintiff indicated neither party wanted to spend money for an attorney since plaintiff's income declined steadily over the years and defendant was self-employed. He described the relationship between defendant and Guarino as amicable. According to plaintiff, defendant did not want alimony because "[s]he wanted to do . . . away with the marriage."

As part of the divorce agreement, plaintiff allowed defendant to use his credit card up to $800 monthly while she "adjusted to her new life." He also paid her car expenses until the end of the lease term, cell phone expenses, the costs associated with her move to South Carolina, health insurance, the couple's tax obligation for 2018, all expenses related to their son, including his college tuition, and a $2,500 retainer for defendant's attorney.

Plaintiff testified he came from "old money" as a result of his father's connections with the Shah of Iran. After his father's death, plaintiff's actual inheritance was far less than plaintiff and defendant anticipated.[9] Plaintiff used

_____

[9] The inheritance totaled 200,000 euros. According to plaintiff, the existing exchange rate in United States dollars was about $185,000.

his inheritance money to make the $250,000 payment to defendant. As of September 2018, when plaintiff agreed to buy the marital home, the Bank of America account held approximately $210,000.[10] All other accounts held relatively nominal sums of money.[11]

By agreement, the couple's assets were in defendant's name. Plaintiff explained he feared the couple would lose everything as a result of various lawsuits against him and his business and his filing personal bankruptcy. According to plaintiff, defendant was aware of their financial situation and placed various bank accounts in her name to protect against potential creditors.

Plaintiff described his lifestyle as of the date of the hearing. At age fifty-four, plaintiff lived with, and provided for, his college-aged son, including the payment of tuition and related school expenses. Plaintiff maintained the household, cooked meals for himself and his son, did the laundry, and drove his

---

[10] Plaintiff's inheritance was deposited into the Bank of America account.

[11] The couple had an account with $5,000 at Chase Bank and $24,000 held in trust by Guarino from a settlement involving a Marriott timeshare. Additionally, there was a TD Bank account, with an unknown amount of money, retained by defendant. These and other dollar amounts are taken from the testimony adduced at the plenary hearing. We note many of the dollar figures contained in the testimony are unsupported by documents admitted as evidence during the hearing.

A-2675-19

son, who was a commuter-student, to and from school. Plaintiff had $3,800 in his retirement account[12] and health coverage through the Affordable Care Act.

## II.

Based on the hearing testimony and documents admitted into evidence[13], the judge issued a January 29, 2020 order and corresponding written decision denying defendant's motion to set aside the MSA. In upholding the MSA, the judge explained a marital agreement would be enforceable provided the agreement was fair, just, and equitable. In determining the MSA was fair, just, and equitable, the judge focused on the credibility of the testifying witnesses.

The judge found "a significant portion of defendant's testimony surrounding her version of the events leading to the signing of the Agreement [wa]s not supported by the evidence." In addition, the judge noted "[d]efendant's testimony was contradicted by both Guarino and plaintiff on several important areas." Specifically, the judge believed the testimony of

---

[12]    At defendant's request, the parties' son was named the beneficiary on plaintiff's retirement account.

[13] The judge included a list of exhibits he considered. Defendant concedes many of the documents included in her appellate appendix were not admitted into evidence and, therefore, not considered by the judge in rendering his decision. We decline to consider documents not admitted as evidence during the plenary hearing.

plaintiff and Guarino "that the issue of alimony never arose during the negotiations, but was only mentioned after the Agreement was signed and the complaint for divorce was filed by plaintiff."

Nor did the judge find defendant was pressured into signing the MSA because the house had to be sold by a date certain. To the contrary, the judge credited the testimony of both Guarino and plaintiff "that the negotiations occurred over several months" and it was defendant who "was anxious to have the matter resolved."

Regarding the advice to seek independent legal counsel, again the judge found credible the testimony proffered by plaintiff and Guarino that defendant was free to retain her own attorney and advised she should do so because Guarino was acting as a neutral mediator. In addition, the judge found the testimony provided by plaintiff and Guarino consistent with the language in the MSA wherein "the parties acknowledge[d] being strongly advised by [the] mediator to obtain independent legal advice and review of this Marital Settlement Agreement before signing it."

With respect to defendant's lack of awareness of the parties' finances and plaintiff's income, the judge found her testimony "incredulous." Because plaintiff was a party to several lawsuits during the marriage and filed for

23

bankruptcy in 2011, the judge explained the parties' assets "including the marital residence and the bank accounts were placed solely in defendant's name." He found "defendant had the 'power of purpose' as she was the signatory" on the account she used to pay the couple's personal expenses and plaintiff's business expenses. In addition, the judge noted defendant's awareness of the parties' finances because the bank statements were addressed to defendant.

The judge reviewed the financial information admitted as evidence during the hearing.[14] Despite having access to all of the couple's financial information, defendant proffered limited financial evidence during the hearing. Defendant denied reviewing the couple's tax returns or any other financial documents during the marriage.

The judge found the couple's "2018 joint tax return, particularly the Schedule C, Profit and Loss statement show[ed] gross receipts of $594,523 (as stated on a 1099 form issued by Aegis Capital to plaintiff) and expenses equal to that amount, netting zero income from plaintiff's business." The 2018 K-1

---

[14] The documents admitted as evidence included the 2018 joint income tax return with attached schedule; the 2017 joint income tax return with attached schedule; the 2017 1099 form from Aegis Capital to plaintiff; and Bank of America account statements from September 2015, November 2016, and February 2018 through September 2018.

schedule[15] issued to defendant indicated ordinary business income, reflecting a distribution in the amount of $116,686, which defendant denied receiving. Plaintiff's K-1 for the same year reflected his distribution from the business in the amount of $70,000. The parties' 2017 joint tax return reported a K-1 issued to defendant for a loss in the amount of $52,245. Defendant failed to produce any evidence or testimony the income distributions reported on the K-1 forms were actually distributed to either party. Nor did she provide evidence the parties' taxable interest in plaintiff's business, as reported in the K-1 forms, translated into real income.

The judge also found defendant's characterization of plaintiff as overbearing and threatening not credible. In describing plaintiff's demeanor during the hearing, the judge noted he was "calm, testified in an even tone, did not avoid questions, and provided reasonable explanations to questions posed to him on cross-examination. Plaintiff's physical appearance was far from threatening . . . . In sum, plaintiff's testimony was believable."

---

[15] A Schedule K-1 is an Internal Revenue Service form that reports each partner's share of a business entity's gains, losses, deductions, credits, and other distributions (whether or not they are actually distributed). The form is used to report the partner's distributive share of the partnership on his or her income tax return. See Internal Revenue Code, 26 U.S.C. §§ 701-704.

The judge explained he was unable to observe Guarino's demeanor but found "his recounting of the events which led to the signing of the [a]greement r[a]ng true and credible." The judge held credibility findings regarding Guarino "could be made to support or contradict his testimony from the documentary evidence and from the fact that the witness is an officer of the court, having an independent ethical obligation to be truthful."

Contrary to defendant's assertion, the judge found Guarino's testimony unbiased as he favored neither party. Further, the judge concluded Guarino displayed no special interest in the outcome of the case. In addition, despite Guarino's limited experience in the field of family law, the judge determined "he [wa]s a seasoned attorney and his professional experience was borne out by his testimony, which was clear, concise and responsive to questions both on direct examination and on cross examination."

Based on the testimony, the judge determined the parties enjoyed a "middle-income lifestyle." He also concluded defendant "has been able to maintain a reasonably similar lifestyle after she accepted the settlement proceeds and moved to South Carolina," noting she has no obligation to pay child support or any portion of her son's undergraduate tuition and expenses.

Regarding alimony, the judge concluded "the amount of alimony and the duration of payment [were] not easily ascertainable and would be the subject of litigation." Based on plaintiff's "failing health and unsteady earnings," the judge determined a waiver of alimony would be attractive "in consideration for other remuneration" and "that is what appears to have occurred." Specifically, the judge found:

> Defendant received one-half of the equity in the marital residence and a considerable amount above that. Although some of the funds paid to her were arguably from marital assets, such as the Marriott settlement, that was the mechanism the parties chose to fund the payment to defendant. Likewise, plaintiff paid a large portion of the monies due to defendant under the Agreement from his inheritance which would have been exempt from equitable distribution.

Finding the MSA was not unconscionable, the judge explained:

> [D]efendant actively participated in the negotiations with the mediator, who was not biased in favor of either party. The competent credible evidence presented that defendant did not insist upon alimony or raise the issue of alimony to the mediator during the course of negotiations. Further, contrary to defendant's assertion that she was not familiar with the parties' finances, the court concludes from the evidence that defendant did have access to marital funds and was acutely aware that [plaintiff's] earning capacity was irregular in the past because of several lawsuits, and is tentative in the future due to his health. She was not threatened or coerced by plaintiff. Rather, both plaintiff and defendant desired to dissolve the marriage; and

27

defendant knowingly and freely waived any right to alimony that she would otherwise be entitled. The evidence does not support defendant's claim that her will was overborn by [plaintiff] and the mediator. Not only did defendant sign the agreement, she accepted the proceeds due to her under the agreement and used them to fund the purchase of an interest in her mother's house in South Carolina. Plaintiff performed his obligations under the Agreement, permitted her to utilize his credit card, and still continues to abide by its terms, paying for defendant's health insurance and cellphone.

In addition, the judge noted the MSA was signed in July 2018 and defendant received payment under the agreement in September 2018, yet "defendant did not contest the validity of the [a]greement until several months later in the Spring of 2019." While the judge remarked defendant "could have achieved a better outcome had she not signed the [a]greement and proceeded to litigate the divorce, she also could not have received a better deal [because] there [wa]s no guaranty of an outcome more favorable to defendant if the Agreement was not executed."

Based on "the totality of the circumstances," the judge held the MSA was valid and enforceable. Specifically, he found:

The [a]greement was the product of an arms-length negotiation between the parties and is not unconscionable in its terms. Defendant did not enter into the [a]greement out of necessity or compulsion, nor did the mediator act as anything other than a neutral

28

party, working with both sides to resolve their financial issues.

After deeming the MSA valid and enforceable, the judge considered plaintiff's request for counsel fees and costs in enforcing the MSA. Defendant opposed the motion. In deciding the fee application, the judge applied Rule 5:3-5(c) and considered the language in the MSA regarding fees and costs. The judge concluded plaintiff was the prevailing party, entitling him to attorney's fees. As a result, the judge entered a February 20, 2019 order and accompanying statement of reasons awarding counsel fees and costs to plaintiff in the amount of $17,500.

III.

On appeal, defendant renews her arguments the MSA was unfair and inequitable, and the judge abused his discretion in denying her motion to set aside the MSA. She also contends the judge's findings were not supported by substantial credible evidence in the record. Specifically, she claims the judge incorrectly found she was paid in excess of her share of the marital home, was not paid with marital assets and did not have an interest in plaintiff's business, plaintiff's income was unsteady, and her standard of living was comparable to the marital standard of living. Further, she asserts Guarino was biased based on

29

his failure to recognize the power imbalance between the parties. In addition, defendant argues the judge's award of costs and fees was improper. We disagree.

"[A]ppellate courts should accord deference to family court factfinding" because family courts exercise "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,'" it has a better perspective than a reviewing court in evaluating the veracity of witnesses. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)). A trial court's factual findings should only be reversed when they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice. Rova Farms, 65 N.J. at 484 (quoting Fagliarone v. Twp. of North Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

A.

New Jersey "has a strong public policy favoring [the] enforcement of agreements." Massar v. Massar, 279 N.J. Super. 89, 93 (App. Div. 1995) (citing

Dep't of Pub. Advoc. v. New Jersey Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)).  This is particularly true in family actions, where "[t]he law grants particular leniency to agreements made in the domestic arena" and allows "judges greater discretion when interpreting such agreements."  Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992) (citing N.J.S.A. 2A:34-23).

"Settlement of disputes, including matrimonial disputes, is encouraged and highly valued in our system."  Quinn v. Quinn, 225 N.J. 34, 44 (2016) (citing Konzelman v. Konzelman, 158 N.J. 185, 193 (1999)).  "Marital agreements . . . are approached with a predisposition in favor of their validity and enforceability" so long as the agreement is voluntary and deemed "fair and equitable."  Massar, 279 N.J. Super. at 93 (citing Petersen v. Petersen, 85 N.J. 638, 642 (1981)).  Our Supreme Court "has observed that it is 'shortsighted and unwise for courts to reject out of hand consensual solutions to vexatious personal matrimonial problems that have been advanced by the parties themselves.'"  Quinn, 225 N.J. at 44 (quoting Konzelman, 158 N.J. at 193).  Thus, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed."  Ibid. (quoting Konzelman, 158 N.J. at 193-94).

Alternatively, a "marital agreement which is unconscionable or is the product of fraud or overreaching by a party with power to take advantage of a confidential relationship may be set aside." Massar, 279 N.J. Super. at 93 (citing Guglielmo, 253 N.J. Super. at 541). "The interpretation, application, and enforceability of divorce agreements are not governed solely by contract law" but instead derive from principles of equity. Konzelman, 158 N.J. at 194.

In determining whether a marital agreement is fair and equitable, a trial judge should consider:

> [T]he adequacy of the agreement at inception, the presumed understanding of the parties at that time, the reasonable expectation of the parties during the life of the agreement, the manner in which the parties acted and relied on the agreement as well as the previously stated principle that agreements by their very nature carry with them a stability that must be respected at the time of enforcement . . . .
>
> [Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004) (citing Konzelman, 158 N.J. at 193).]

A trial court must ensure there was no "coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent." N.H. v. H.H., 418 N.J. Super. 262, 282 (App. Div. 2011) (quoting Peskin v. Peskin, 271 N.J. Super. 261, 276 (App. Div. 1994)). If there is no "unconscionability, fraud, or overreaching in the negotiations of the settlement,

[there is] no legal or equitable basis . . . to reform that parties' . . . agreement." Ibid. (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)). Unconscionability is present when a party's interests are not properly or adequately represented or there is overreaching by the opposing party. See Quinn, 225 N.J. at 47.

Here, the judge based his findings on the credibility of the witnesses. He found defendant's testimony throughout the hearing "incredulous." On the other hand, he found the testimony of plaintiff and Guarino to be consistent and credible, finding there was no unconscionable, fraudulent, or overreaching conduct in the negotiation and execution of the MSA. The judge's decision was based on his credibility determinations, to which we defer, and his finding are supported by substantial credible evidence in the record.

Defendant's waiver of alimony and relinquishment of any interest in plaintiff's business did not render the MSA invalid. Defendant wanted to be released from a stressful marriage and knew the family's finances were unstable. She also received the parties' monthly bank statements and recognized the funds in the joint account steadily declined after 2016. In addition, defendant was aware of plaintiff's deteriorating health and receipt of a significantly smaller inheritance from his father.

Under the MSA, defendant received $250,000 for agreeing to dissolve the marriage. The judge found defendant received "one-half of the equity in the marital residence and a considerable amount above that," and his findings were supported by the testimony and evidence.

Relying on the testimony and evidence adduced during the hearing, we accept, as did the judge, the $680,000 reduced sale price as the value for calculating the parties' interest in the home.[16] Subtracting $310,000, representing the outstanding mortgage, from the $680,000 listed sale price, the equity in the marital home totaled $370,000.[17] Dividing that amount equally, the sum of $185,000 represented the party's one-half interest in the marital home. Thus, the judge correctly concluded the sum paid by plaintiff represented defendant's one-half share of the couple's assets, including cash and equity in the home consistent with plaintiff's testimony.[18]

---

[16] Defendant offered no testimony to support her claim the house was worth $700,000.

[17] Because plaintiff agreed to purchase the home, there is no need to subtract a potential brokers' commission.

[18] According to the testimony, as of September 2018, there was $210,000 in the Bank of America account, $24,000 held as part of the "Marriott" settlement, and $5,000 in a Chase account.

The judge acknowledged defendant waived alimony and relinquished any interest in plaintiff's business[19] in return for $250,000. However, he found she reaped other financial benefits from the divorce. For example, defendant has no obligation to pay any expenses related to her son. Also, above the payment of $250,000, plaintiff paid for the following: the parties' 2018 tax obligation; defendant's move to South Carolina; and retainer for defendant's attorney. Between the date transferring the house and finalizing the divorce, plaintiff allowed defendant to use his credit card for personal expenses up to $800 per month. Additionally, under the Share Transfer Agreement, defendant received $200 bi-weekly from September 2018 until the end of the year. Plaintiff also pays defendant's medical insurance premiums and cellphone expenses.

Given defendant's receipt of the foregoing financial benefits beyond the $250,000 payment, it was not unreasonable or unconscionable for her to waive alimony and relinquish a share in plaintiff's business, especially in light of plaintiff's declining health and inability to continue earning at the same level as during the marriage. We agree with the judge's conclusion such payments by

---

[19] To receive equitable distribution of an interest in plaintiff's business, defendant would have been required to retain a forensic accountant. She did not hire an accountant to value the business in connection with the plenary hearing. In fact, defendant did not seek an equity interest in plaintiff's business until she filed this appeal.

plaintiff "ma[de] it attractive for a waiver of alimony in consideration for other remuneration."

Based on the record, we are satisfied defendant was aware of the couple's finances, urged to retain her own attorney to review the MSA, knew the mediator did not represent her interests, consulted with Guarino on multiple occasions concerning the MSA, requested and received modifications to the draft MSA, and knowingly and voluntarily accepted the MSA. Defendant failed to proffer sufficient evidence the agreement was unfair, inequitable, or the result of overreaching or unconscionable actions.

B.

Defendant contends the money she received from plaintiff was marital property subject to equitable distribution. According to defendant, plaintiff purchased her share of the marital home using his inheritance which was commingled with "marital funds and . . . used to pay family expenses" in the Bank of America account. Defendant claims all of the money in the Bank of America account constituted marital assets and, therefore, she was not properly compensated in accordance with the MSA.

Marital assets are subject to equitable distribution upon divorce. See Genovese v. Genovese, 392 N.J. Super. 215, 225 (App. Div. 2007). Exempt

36

from equitable distribution is "property, real, personal or otherwise, legally or beneficially acquired during the marriage of civil union by either party by way of gift, devise, or intestate succession."  N.J.S.A. 2A:34-23(h).  If separate property is commingled, it will be treated as marital property subject to equitable distribution unless there is "a clearly manifested and unequivocal intent that they belonged to [one spouse] and would ultimately be returned to [him or] her." Wadlow v. Wadlow, 200 N.J. Super. 372, 380 (App. Div. 1985).

We reject defendant's argument the judge erred in failing to find plaintiff used commingled marital assets to pay defendant in accordance with the MSA. The comingling of the parties' assets was not raised to the trial court and, therefore, will not be considered on appeal.  See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'")).

Based on the testimony and documentary evidence, as of September 2018 when the house was transferred to plaintiff, the Bank of America account

contained $210,000. After deducting $30,000, which the parties agreed to use for their son's college tuition, approximately $180,000 remained in that account. According to the testimony, at least $185,000 in the Bank of America account represented plaintiff's inheritance to which defendant was not entitled. Because there were no funds above plaintiff's $185,000 inheritance in the Bank of America account as of September 2018, plaintiff's use of that account to fund his payment obligation to defendant was not improper.

Even if the inheritance was marital property, the MSA specified the parties' agreement on the funds to be used to pay defendant. Paragraph 2 of the addendum read plaintiff "shall pay [defendant] a total of $250,000, of which $240,000 shall be paid immediately from cash held at Bank of America, the Marriott Settlement and cash held at Chase."[20] While defendant may have been paid with approximately $14,500 of her own money from the Marriott Settlement and the Chase account, nothing in the MSA prohibited the parties from voluntarily agreeing to a distribution scheme that deviated from traditional concepts of equitable distribution. The parties not only agreed upon the amount

---

[20] As of July 2018, when the parties signed the MSA, the account statement from Bank of America reflected the sum of $210,638.22. This amount, plus the $24,000 from the Marriott Settlement and the $5,000 in the Chase Bank account, approximated the $240,000 sum which plaintiff agreed to pay to defendant.

A-2675-19

plaintiff would pay defendant, but also agreed which funds would be used to satisfy the payment obligation, inclusive of plaintiff's inheritance money.

On this record, we are satisfied the parties' agreement to use the Bank of America account toward satisfaction of plaintiff's financial obligation did not include commingled marital funds such that defendant was paid with her own money. In fact, prior to filing her appeal, defendant never claimed the entirety of the funds in the Bank of America account were marital property.

C.

Defendant also argues the judge's order granting $17,500 in attorney's fees and costs to plaintiff was improper. Defendant contends the fee shifting provision in the MSA was unenforceable because it was unfair and unreasonable. According to defendant, the attorney fee provision benefitted plaintiff only and discouraged her from challenging the agreement. Defendant further claims the attorney fee provision was inapplicable under these circumstances because plaintiff "was not acting to establish or enforce a right resulting from the Agreement." In addition, she asserts an analysis under Rule 5:3-5(c) supports the conclusion each party should be responsible for payment of his or her legal fees.

Rule 5:3-5(c) requires a judge consider the following factors in deciding to award counsel fees in a matrimonial action:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (2) the reasonableness and good faith of the positions advanced by the parties; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [Strahan v. Strahan, 402 N.J. Super. 298, 316-17 (App. Div. 2008) (quoting R. 5:3-5(c)).]

An award of counsel fees should only be disturbed on the "rarest occasion" based on a "clear abuse of discretion." Id. at 317 (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

Here, Paragraph 13 of the MSA provides:

> Litigation Fees and Costs. Should any attorneys' fees be incurred in connection with the domestic relations lawsuit to be filed, each party shall bear and pay his/her own attorneys' fees.
>
> If any suit, action or other proceeding (including any proceeding under the U.S. Bankruptcy Code) or appeal from a decision therein is instituted to establish, obtain, or enforce any right resulting from this [a]greement, the prevailing party shall be entitled to recover from the other party. [I]n addition to costs and

40

disbursements, such additional sums as the court may adjudge reasonable as attorneys['] fees, both in the trial and appellate courts, whether or not such right to attorney fee is established by statute.

The judge relied on the MSA's language in awarding attorney's fees to plaintiff, finding the agreement did not preclude such an award. To the contrary, he determined the MSA compelled an award because plaintiff "litigate[d] to establish, obtain and enforce his rights under the [a]greement." Further, the judge explained "the attorney fee provision in the [a]greement [wa]s neither unreasonable, unfair, nor unconscionable," and either party stood to benefit under that provision in the MSA depending on the outcome of the plenary hearing.

Beyond considering the language in the MSA governing attorney's fees, the judge also conducted a Rule 5:3-5(c) analysis. The judge concluded:

> Applying the . . . factors, taking into account defendant's limited ability to pay fees to her attorney and to contribute to plaintiff's legal expenses, weighed against the amount charged by plaintiff's attorney, defendant's incredulous position advanced at the hearing, and the favorable outcome to plaintiff, it is fair and equitable that an award of $17,500 for attorney fees and costs be ordered.

We are satisfied the judge did not abuse his discretion in awarding $17,500 in attorney's fees and costs to plaintiff. Our reading of the MSA does

41

not preclude plaintiff's ability to obtain fees and costs he incurred litigating the enforceability and validity of the MSA.

Moreover, the judge engaged in the required analysis under <u>Rule</u> 5:3-5(c) in awarding fees and costs to plaintiff. His findings were based on credible evidence in the record regarding the relevant factors, including the parties' ability to pay, the reasonableness of the parties' arguments, and the parties' existing financial circumstances.

Defendant's arguments fail to support her claim that the judge's determinations were so wide of the mark as to result in a clear mistake mandating reversal. The judge's factual findings and credibility determinations are supported by the credible evidence in the record, which consisted predominately of the witnesses' testimony and documents admitted at the plenary hearing.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

42